The American Central Insurance Company, Appellant, v. Chicago & Alton Railway Company, Respondent.

Kansas City Court of Appeals, March, 7, 1898.

1. **Contracts**: PUBLIC POLICY: COURT'S DUTY. A contract is void as against public policy if it is injurious to the public interest and courts will lend it no countenance.

2. **Common Carriers**: CONTRACT: NEGLIGENCE. A common carrier is not permitted to contract against its own negligence.

3. **Railroads**: CONTRACTS: FIRES: PUBLIC POLICY. A contract between a railroad and its lessee who establishes an elevator on its right of way whereby the lessee releases the railroad from all damages occurring to such elevator and its contents by reason of fire, is not in violation of a rule of public policy.

4. **Common Carriers**: DISCRIMINATION IN FREIGHT RATES: STATUTE. A stipulation between a railroad and its elevator lessee by which the former is to carry the latter's grain from the elevator in car load lots at a less rate than its regular tariff or than the charges to transient shippers, does not violate Revised Statutes against discrimination by carriers.

5. **Landlord and Tenant**: SUBLESSEE: PAROL ASSIGNMENT. Where a stranger to a lease is by both lessee and lessor recognized as sublessee under a parol agreement and as such receives the benefits of the lease, he is estopped to deny that he is such lessee because the assignment is in parol and must be bound by the stipulations of the original lease.

*Appeal from the Jackson Circuit Court.*—Hon. C. L. Dobson, Judge.

Affirmed.

Fyke, Yates & Fyke for appellant.

(1) The contract between the defendant and John M. Woodson, which was assigned to Bridges,

offered in evidence by defendant, is against public policy and void. It is an attempt of the defendant, by the contract, to exempt itself from liability, for loss caused by fire even though the negligence of defendant caused the fire. It can not so exempt itself. Leonard v. R. R., 54 Mo. App. 293; George v. R'y, 57 Mo. App. 358; Walker Bros. v. R'y, 68 Mo. App. 465; Witting v. R. R., 101 Mo. 631; Otis Co. v. R. R., 112 Mo. 622; Reed v. Tel. Co., 135 Mo. 661; Johnson's Adm'x. v. R. R., 11 S. E. Rep. (Va.) 829; R. R. v. Ryan, 11 Kan. 609; Bishop on Contracts [Enlar. Ed.], secs. 473-477, p. 181; Cooley on Torts, 687; Lawson on Contracts, sec. 332, p. 350; Lawson on Contracts, sec. 336, p. 353. (2) The consideration upon which said contract is based, to wit, that the railroad company would transport the grain of John M. Woodson at one cent per hundred pounds less than grain of the public generally, and would give said Woodson a rebate of one cent per hundred pounds on all grain shipped from Norton station is against public policy, and is in violation of section 2620, Revised Statutes 1879. R. S. 1879, secs. 2630, 2632; Friend v. Porter, 50 Mo. App. 89; Chouteau v. R'y, 22 Mo. App. 286; Hatch v. Hanson, 46 Mo. App. 323. If part of the consideration be tainted with illegality, the whole contract is void. Beck v. Neal, 45 Mo. App. 475. (3) Said contract is invalid because in conflict with Revised Statutes 1889, sec. 2615; Reichard v. Ins. Co., 31 Mo. 518; Havens v. Ins. Co., 123 Mo. 403-421; Relfe v. Ins. Co., 5 Mo. App. 173-180; Jacobs v. Ins. Co., 61 Mo. App. 572-575; Assurance Society v. Pettus, Adm'r, 140 U. S. 226; Bank v. Owens, 2 Pet. 527; Scott v. Lloyd, 34 U. S. 9 Pet. 418; Thomas v. R. R., 101 U. S. 71; Clark v. Spencer 14 Kan. 399; Bosler v. Rhiem, 72 Pa. 54; Mathews v. R. R., 121 Mo. 298; West v. R. R., 77 Iowa, 634;

35 N. W. Rep. 479; Id., 42 N. W. Rep. 512; Lawson on Contracts, sec. 279, p. 290; Lawson on Contracts, sec. 294, p. 310. (4) Even if the court should hold the contract between Woodson and the railroad company to be valid, still it is defense in this action, because neither the Meade Mercantile Company nor the insurance company were parties to that agreement, so that their rights can not be affected thereby. The contract is *res inter alios acta* and void as to the insurance company.

R. H. FIELD and WASH ADAMS for respondent.

(1) How could the doctrine of subrogation in this case help the plaintiff? The plaintiff insurance company claiming subrogation could have no greater or better right than the Meade Mercantile Company had. If the Meade Mercantile Company could not recover neither can the plaintiff. Ins. Co. v. Transportation Co., 117 U. S. 321; Ins. Co. v. Wenton W. Co., 42 Mo. App. 118–123; Comegys v. Vasse, 1 Pet. 193; Fretz v. Bull, 12 How. 466; The Monticello, 17 How. 152; Garrison v. Ins. Co., 19 How. 312; Hau v. R. R., 13 Wall. 367; The Potomac, 105 U. S. 630; R. R. v. Judy, 111 U. S. 584; Clark v. Wilson, 103 Mass. 319; Simpson v. Thompson, 3 App. 279; Ins. Co. v. Thedoik, 25 Ohio St. 50; York Co. v. R. R., 3 Wall. 107–170; Express Co. v. Caldwell, 21 Wall. 264; Hart v. R. R., 112 U. S. 331. The Meade Mercantile Company (in whose place and for whom plaintiff complains) contracted away its right to hold the defendant liable for the alleged loss by virtue of its relation to the lease of the building in which the loss is alleged to have occurred. (2) The authorities cited by appellant holding that a party can not contract against his own negligence, for the reason that such

contracts are against public policy, are utterly irrelevant, for the very plain reason that negligence on the part of the defendant is neither alleged nor proven as the cause of the alleged loss. The decisions that we have found as to the precise question presented are flatly against the contention of the appellant. Griswold v. R. R., 57 N. W. Rep. 843; Ins. Co. v. R'y, 70 Fed. Rep. 201; s. c., 62 Fed. Rep. 904; Stephens v. R. R., 109 Cal. 86. (3) It was, however, not necessary, in order to make the provisions of said lease bind the Meade Mercantile Company, that either it or its agent should have signed it. By going into and continuing in possession of the premises as tenant under John M. Woodson, the lessee in the lease, and enjoying its privileges, a contract to become subject to its provisions arose in two ways on the part of the Meade Mercantile Company, *first*, by privity of estate in said lease and premises (Whetstone v. McCortney, 32 Mo. App. 430, and cases cited; Trauerman v. Lippincott, 39 Mo. App. 470), and, *second*, by estoppel, and in either form is as binding as if the contract had been signed by it in its own name. Light v. R'y, 89 Mo. 108; Stone v. Pennock, 31 Mo. App. 544; Imboden v. Ins. Co., 31 Mo. App. 321; Herman on Estop., sec. 1039; Bigelow on Estop. [4 Ed.], p. 456 and note 4; Thomas v. R. R., 82 Mo. 538; Nolan v. R. R., 23 Mo. App. 353; Herman on Estop., sec. 1039.

SMITH, P. J.—It is disclosed by the record before us that on the twenty-third day of May, 1894, one John M. Woodson was the owner of an STATEMENT. elevator and warehouse situate on the defendant's right of way at the station of Norton, in this state. Said elevator and warehouse were placed on defendant's right of way by Woodson

under a contract entered into between the defendant and himself, which is as follows, to wit:

"This agreement made and entered into this eighteenth day of March, 1880, by and between the Chicago & Alton Railroad Company, party of the first part, and John M. Woodson, of St. Louis, * * * party of the second part, witnesseth: That the said party of the first part for and in consideration of the shipment at all times hereafter upon and over the line of the first party, of all grain received by said second party in the warehouse hereinafter authorized to be constructed, and in further consideration of the covenants, provisions, conditions and agreements hereinafter contained, on the part and behalf of said second party to be observed and performed, hereby grants unto the said second party the right to erect upon such portion of any land belonging to said first party not otherwise occupied, as may be selected and designated by the general manager of the railroad of said first party at or near the station of Norton, Saline county, Mo., a warehouse suitable for the reception, storage and shipment of grain at said station. And said first party further covenants to and with said second party that the said second party shall have the right to occupy and use such portion of land selected and designated as aforesaid for the location of said warehouse for and during the full term of twenty years from the date of this agreement, free of payment of rent therefor, unless the occupancy of said premises shall be sooner terminated in the manner hereinafter provided and mentioned or otherwise. * * * And for the consideration aforesaid, the said first party hereby covenants and agrees to and with said second party that if said first party will at all times hereafter, during the continuance of this lease, transport all grain in bulk which may be to it, said first party,

delivered by said second party, at said warehouse,. when the cars of said first party, as hereinafter specified, in quantities not less than one full car load at one time, to other stations upon its railroad, at a rate which shall be less by one cent per one hundred pounds for grain in bulk than the regular tariff price of said first party or than the charges made by said first party to transient shippers who deliver grain to said first party by wagons or otherwise. And said party of the second part, in consideration of the covenants herein contained on behalf of the first party, and the right herein granted by said first party, hereby covenants and agrees that he will, within ninety days from the date of this agreement, at his own proper cost and charges, erect upon the said portion of ground selected and designated as aforesaid, at the said station of Norton, a good and substantial warehouse and elevator of the capacity of ten thousand bushels of grain. * * * And said second party hereby further agrees that he will charge for storage and delivery of grain from said warehouse, only reasonable and compensatory commissions, and such as may be charged for like services at other warehouses of similar character along the line of the railroad of said first party.

"And said second party hereby further agrees to and with said first party that said first party shall in no case be held pecuniarily liable for damage to said warehouse or to the contents thereof by fire from any cause whatsoever, and that he, the said second party shall not nor will at any time or times hereafter during the continuance of this license, lease or agreement, receive any grain * * * from any person or persons whomsoever * * * who desire to store said goods in said warehouse, or to use said warehouse for the purpose of delivering said goods or grain upon

the cars of said party of the first part, unless the same be stored subject to the following stipulations, to be signed by the person or persons storing said goods or delivering said grain,   *   *   *   viz.:

"First Stipulation:   For a valuable consideration I hereby agree that the Chicago & Alton Railroad Company shall in no wise be held liable for any loss or damage which may be done to my goods, grain, wares or merchandise, stored in the warehouse of John M. Woodson, at Norton station, on their line of railroad, by means of fire from any cause whatever. * * * And said second party hereby agrees that he will not sublet or in any manner assign, transfer or part with the possession of said warehouse or this contract or agreement, without the consent in writing of the general manager for the time being of the party of the first part for that purpose first had and obtained.

"CHICAGO & ALTON RAILROAD CO.,

"By T. B. BLACKSTONE, President.

"JOHN M. WOODSON."

Some time after the said Woodson had erected said elevator and warehouse, with the consent of defendant he leased the same for a period of three years to John E. Bridges, upon the "condition that the said Bridges should, for that period, covenant that he would faithfully observe, keep and perform all the covenants and undertakings in the lease and contract mentioned on the part of the said Woodson to be kept and performed." It further appears from the evidence that said Bridges was, at the time of the assignment of said lease to him, a director of the Meade Mercantile Company, a business corporation, dealing in grain and merchandise. He testified that he entered into a verbal arrangement with said Meade Mercantile Company by which it paid the monthly rent to Woodson and received from the defendant the rebate specified in the

lease to Woodson. Under said arrangement he was to operate the elevator and warehouse for the said Meade Mercantile Company on a salary to be paid by the latter. On the twenty-third day of May, 1894, the Meade Mercantile Company had grain and grain sacks in said elevator and warehouse which was insured by the plaintiff against damage by fire. On said last named date the said elevator and warehouse, including the grain and grain sacks therein of the Meade Mercantile Company, were wholly destroyed by fire. We will assume, for our present purpose that the elevator and warehouse with the grain and grain sacks therein covered by the policy of insurance was destroyed by fire communicated by the locomotive engines in use upon the defendant's railroad. The plaintiff paid the said Meade Mercantile Company the reasonable value of the said insured property and then brought this suit, claiming that it had become subrogated to all the rights of the Meade Mercantile Company against defendant for the loss.

The defendant claims that under the provisions of the contract previously quoted it was exempt from liability for the loss sustained by the Meade Mercantile Company and therefore plaintiff's claim is groundless. The plaintiff, on the other hand, contends that the provisions of said contract so relied on by defendant are contrary to public policy and therefore void, and whether or not this contention can be sustained is the dominating question which we are called upon to decide.

A contract is void as against public policy if injurious to the interests of the public or if it contravenes some established interest of society. It is well settled in the law of contracts that the CONTRACTS: public policy: court's duty. first purpose of the courts is to look to the welfare of the public and if the

enforcement of the agreement would be inimical to its interests no relief should be granted to the party injured, even though it might result beneficially to the party who made and violated the agreement. And so it has been said by a learned judge: "It is the duty of all the courts of justice to keep their eye steadily upon the interest of the public even in the administration of commutative justice; and where they find an action is founded upon a claim injurious to the public and which has a bad tendency, to give no countenance or assistance *in foro civile.*" Greenhood on Public Policy, 2; Crawford v. Wick, 18 Ohio St. 190. And it has been declared by numerous authorities that the common law will not permit individuals to oblige themselves by contract either to do or not to do anything where the thing to be done or omitted is in any degree clearly injurious to the public. Greenhood on Public Policy, 2, and the authorities there cited.

In the light of the foregoing definitions we shall now proceed to inquire whether the provisions in said contract, if carried into effect, would be injurious to any public interest or, which is in effect the same thing, whether the public has any interest in its provisions. It has been long settled in this state that a common carrier is not permitted to contract against its own negligence. Clark v. R'y, 64 Mo. 446; McFadden v. R'y, 92 Mo. 348; George v. R'y, 57 Mo. App. 358. There can be no doubt that a contract of a railway company with one of its employees, or with a passenger, or with a shipper, to exempt itself from liability for negligence in operating its road is against public policy and void. To this the authorities are all agreed.

*Common carriers: contractors: negligence.*

But under the provisions of section 2615, Revised Statutes, every railway company in this state is made

an insurer absolutely responsible in damages to every person whose property may be injured or destroyed by fire directly or indirecty communicated by its locomotive engines. It is not required in such cases to prove negligence on the part of the railway company in order to render it liable for the loss. Walker v. R'y, 68 Mo. App. 465. The plaintiff does not, in its petition, claim that the loss of the Meade Mercantile Company was occasioned by the negligence of the defendant. Both the allegations of the petition and the proof conclusively show that the plaintiff seeks to hold the defendant liable under the statute for the loss. The defendant only contracted for exemption against a statutory liability where negligence is not a ground thereof. It is well settled in this state that where a railway passes through the inclosed fields of the landowner, he may, as far as he is concerned, contract away the right to have fences, inclosing the right of way through his lands, gates thereon, farm crossings, and the gates thereat, to which he is entitled under section 2611, Revised Statutes. Madison v. R'y, 60 Mo. App. 599; Berry v. R'y, 65 Mo. 172; Harrington v. R'y, 71 Mo. 384; Johnson v. R'y, 80 Mo. 620; Peddicord v. R'y, 85 Mo. 160. If these and other rights conferred by statute may be contracted away why may not that given by section 2615, Revised Statutes? It can not, with any show of reason, be contended that such contracts are obnoxious to the rule that forbids a railway company from contracting against its own negligence.

The contract in issue here is not analogous to that where a railway company contracts with one of its employees to exempt itself from liability for negligence in operating its railway, for the reason that the law imposes upon a railway company the absolute duty to

RAILROADS: contracts: fires; public policy

operate its railway, to employ suitable men to operate it, to exercise ordinary care to furnish them with a reasonably safe place in which to render their services, and with reasonably safe machinery and appliances with which to perform them. Any breach of this duty is a violation of the law which imposes the duty. It is also an injury to the public interest because it endangers the lives and limbs of citizens which are of the highest value to the state. A contract which exempts the carrier from negligence in the discharge of these duties is void because it relieves it of the performance of an absolute duty which the law imposes upon it and immeasurably endangers the lives of employees and passengers. But the law imposes no duty upon a railway company to lease its right of way. In the former case public policy and the law imposes upon the carrier certain duties in order to protect its employees from injury, and therefore it may not contract to be relieved from the law and duty. The carrier has no choice. It must perform these duties or forfeit its charter. In the latter case no duty to lease is imposed. It has the option to lease or not, and if it does lease and stipulate for exemption from damages caused by fire communicated by its locomotive engines to the property of the lessee placed upon the leased premises by its permission that contract in no way relieves it from the discharge of any duty it owes the public that the law and public policy had imposed upon it. Nor is the contract here similar to that of a railway company with a passenger or shipper, for the reason that the law imposes upon a railway company also the absolute duty to accept passengers and freight when offered and to carry the former with the utmost and the latter with ordinary care. In making their contracts the latter do not stand on an equal footing with the former. They can not stop to negotiate and settle the terms of

a contract every time they desire to use a railroad. They would often prefer the abandonment of the contracts to such negotiations. The railway company with its trained employees, its monopoly of the transportation facilities sought has the ability and the power to exact the contract it desires. This inequality in the situation of the parties which would, if permitted, enable the railway company to obtain unfair contracts from passengers and shippers and the fact that contracts with them which exempt the company from liability for negligence, relieve it from an absolute duty imposed by law and thus violate it and at the same time increase the danger to the lives and property of the people from the operation of a railway, constitute the reasons for the decisions that have established the rule that such contracts are against public policy. R'y v. Lockwood, 17 Wall. 57; York v. R'y, 3 Wall. 107; Steam Co. v. Ins. Co., 129 Wall. 397; Express Co. v. Caldwell, 21 Wall. 264.

Here the defendant and Woodson, the lessee, stood upon an equal footing. The lessee was not compelled to lease of the defendant. Each party had the option to execute or refuse to execute the lease. The condition exempting defendant from liability for damages to the property of the lessee caused by fire communicated by defendant's locomotive engines relieved the defendant from no duty it was required by law to perform, but simply provided that it should not assume an additional burden which it had the option to refuse. It is thus seen that all the reasons for the application of the rule avoiding contracts exempting carriers from liability for negligence fail in a case like the present.

Again the defendant's *quasi* public character as a railway company, its position as a common carrier imposed upon it no duty to lease any part of its right of way to Woodson or any one else, nor had he or any

one any right to the use of the leased premises before the lease was made. The property that was burned was the private property of the Meade Mercantile Company which was stored by it in the warehouse situate on the leased premises. None of the property so destroyed was in process of transportation by the defendant, none of it was awaiting delivery by the defendant to its consignees after transportation, and none of it had been received by the company for transportation. The elevator and warehouse and the property in it bore the same relation to the carrying business of the defendant that the store and contents of any merchant or commission man would bear to it. Neither the lease nor the relation of the property to the defendant arose out of the discharge of any duty imposed upon it by its position as a common carrier or by its character of a *quasi* public corporation. It seems to us that the fact that the defendant is a common carrier has no place in this case. The rights of parties dealing with common carriers and the duties of common carriers toward parties with whom they deal and toward the general public are elements foreign to any question here involved.

There is nothing in the record tending to show that the defendant ever had employed Woodson, the lessee, or the Meade Mercantile Company to deliver or store any of the goods of its shippers, but if so no reason is perceived why the contract of the lessee to take the risk of and to hold the defendant harmless from any damage to such property from fires caused by its locomotive engines would not have been valid. It is thus made plain that a railway company does not assume by a contract like the present to relieve itself of any of its essential duties as a common carrier or as a *quasi* public corporation. The contract leaves it under the same duties and liabilities to which it was subject before it was made. It

is bound by the same diligence, fidelity and care after the lease containing such contract is executed that it would have been required to exercise if no such contract had been made.

We therefore conclude that it was not a violation of any rule of public policy for Woodson, the lessee, to agree under the circumstances stated that if he was permitted to put his elevator and warehouse upon the right of way of the defendant, and to use the same thereon for storage purposes, the duties and liabilities of the latter to him and to the public should remain the same as they were before the lease was made and should not be increased by any additional burden. By reference to Griswold v. R'y, 57 N. W. Rep. 843, and Ins. Co. v. R'y, 70 Fed. Rep. 201, and Stephens v. R'y, 109 Cal. 86, it will appear that the reasoning of those cases, as far as deemed applicable, has been adopted in this.

The plaintiff further contends the clause in said contract which provides that in consideration of the matters and things set forth in a clause thereof the defendant agreed to transport all grain in bulk which might be to it delivered by the lessee at said warehouse in quantities not less than one full car load at one time to other stations upon its railroad, at a rate which should be less by one cent per one hundred pounds for grain in bulk than the charges made by it to transient shippers who deliver grain to it by wagons or otherwise, is a violation of sections 2620, 2630 and 2632, Revised Statutes, and is therefore void. The question is, does this clause of the contract just referred to fall within any prohibitions of the statute, for if so it must be held invalid. "Any act which is forbidden either by the common law or the statutory law—whether it is *malum in se* or merely *malum prohibitum*; indictable, or only subject

COMMON carriers: discrimination in freight rates: statute.

to a penalty or forfeiture; or however otherwise prohibited by statute, or the common law—can not be the foundation of a valid contract; nor can anything auxiliary to, or promotive of, such act." Bishop on Contracts [Ed. 1887], sec. 471; Friend v. Porter, 50 Mo. App. 89; Hatch v. Hanson, 46 Mo. App. 323; Chouteau v. R'y, 22 Mo. App. 286.

But we do not think the recitals in the clause of the lease now in question are subject to the plaintiff's objection. The discrimination of a railway company between shippers over its line that is prohibited by said sections 2620 and 2630 is fully defined in section 2632, and the only effect of the latter seems to be to define the scope and meaning of the former. These sections are of course in *pari materia* and must be read together in order to understand the full purpose of the legislature in enacting them. The latter section provides that if the railway company shall "charge, demand, collect or receive from any person or persons, firm or corporation, a greater or less compensation, for any service rendered in the transportation of any kind of property upon such railroad within this State than it charges, demands, collects or receives from *any other* person, persons, firm or corporation for doing for him or them *a like service* in the transportation of a like kind of property *under substantially like circumstances and conditions*, such common carrier shall be deemed guilty of unjust discrimination, *which is hereby prohibited and declared unlawful.*" The contract contained in the lease in question is not shown to have called for any greater or less compensation from the lessee than was to be called for from others by the defendant for "*a like service   *   *   *   , under substantially like circumstances and conditions.*"

From the face of the lease it very clearly appears that the service for which the rebate was to be allowed

the lessee, and those claiming under it, was not the same nor as great as that afforded to the ordinary *transient* shipper. The transient shipper furnishes no warehouse for the storage nor any supervision of his grain nor the labor necessary to handle the same but these are supplied wholly by the carrier. Not so with the lessee of the carrier who constructs his own store-house and also supplies at his own expense the supervision and labor necessary for the care, storage and loading of his grain, the carrier thereby escaping much expense that it must incur in the case of transient shipper. The exact provision of the lease complained of is that the defendant will carry for the lessee "in quantities *not less than one full car load at one time,* to other stations upon its railroad, at a rate which shall be less by one per cent per one hundred pounds for grain in bulk, than the regular tariff price of said first party, or than the charges made by said first party to *transient shippers* who deliver grain to said first party by wagons or otherwise." It is manifest from the provisions of the lease, that the lessee was to do a large business, and be a regular and constant shipper over the road of the defendant. The rebate to be allowed was not "one per cent per one hundred pounds" below what was charged like shippers who provided the warehouses and labor at their own expense to care for and handle the shipments, but the rebate was one per cent per one hundred pounds below what the freight cost "transient shippers," a totally different kind and class of shippers, who saved the defendant none of the expense of caring for or handling their shipments. We can not for these reasons think the contract should be held invalid on the grounds of unlawful discrimination.

It will be remembered that Woodson, with the assent of defendant, made an assignment of the lease

to Bridges, who was then a director of the Meade Mercantile Company. Bridges conferred with the directors before he procured the assignment. The assignment was procured by him with its knowledge and for its benefit. After he procured the assignment he turned over the possession of the elevator and warehouse to it. He was employed by it to manage and operate the same. It paid the lessee the rent and received of the defendant the rebates. It thereby became to all intents and purposes as much the sublessee of the property as was Bridges. It was clearly estopped to assert as against either the defendant or Woodson that it was not in possession under an assignment of the lease. On the other hand the defendant was equally estopped to deny its assent to the assignment. The defendant recognized and treated the Meade Mercantile Company. as an assignee of the lease. How could the Meade Mercantile Company, after entering into the use and enjoyment of the property under the lease; after receiving from the defendant the rebates provided in the lease; and after having paid to Woodson the monthly rent agreed by Bridges to be paid to him for the property during the term of the sub-letting, be heard to claim 'that it was not an assignee of the lease or that it did not occupy identically the same relation to the defendant that Woodson and Bridges did, even though there was no formal assignment of the lease shown in evidence. It seems obvious to us that by reason of the facts already adverted to that the Meade Mercantile Company was the successor to all the obligations arising on the original lease between the defendant and Woodson and must be so regarded in disposing of the present controversy. Light v. R'y, 89 Mo. 108; Thomas v. R'y, 82 Mo. 538; Stone v. Pennock, 31 Mo. App. 544; Imboden v. Ins. Co., 31 Mo. App. 321; Nolen v. R'y, 23 Mo. App. 353;

*LANDLORD and tenant: sublessee: parol assignment.*

Herman on Estop., sec. 1039; Bigelow on Estop. [4 Ed.] 456, and note 4 thereto.   The lease contract was not therefore, as the plaintiff insists, *res inter alios acta*. It follows from the foregoing considerations that the rights and duties of the Meade Mercantile Company and the defendant must be ascertained and determined by the provisions of the lease.

If the plaintiff in this action, as it contends, stands in the shoes of the Meade Mercantile Company, it is certainly in no better situation than the latter company would be were it suing to recover for the loss.  Ins. Co. v. Water Works Co., 42 Mo. App. 118; Ins. Co. v. Transportation Co., 117 U. S. 321.  Since the contract for exemption contained in the lease was valid it afforded defendant a complete defense to any action brought against it by either the Meade Mercantile Company or the plaintiff to recover damages for the loss of the property covered by the policy of insurance issued by plaintiff.

In the view of the case taken by us it has become unnecessary to notice the other points suggested and discussed by the defendant's counsel in his brief.

The judgment will be affirmed.   All concur.