Missouri, Kansas & Texas Railway Company of Texas v. W. T. Carter & Brother et al.

No. 1051. Decided May 12, 1902.

1.—Contract—Consideration—Establishment of Railway Switch.

The establishment, by a railway, of a switch at a given point for the convenience of a private business, with the agreement not to remove it without reasonable notice and the implied obligation to maintain it in order and furnish cars and receive shipments there, was a sufficient consideration for a promise by the proprietor of such business to release the railway company from liability for damages to his property at that place by fire communicated from its locomotives. (P. 475.)

**2.—Railway—Negligence—Contract Exempting from Liability—Carrier.**

The statute prohibiting a carrier from limiting its liability by contract has no application to a contract by a railway company for exemption from liability for damage by fire to property not in its possession as carrier. (Pp. 475, 476.)

**3.—Railway—Fire—Negligence—Contract    Exempting    from    Liability—Public Policy.**

No general rule of public policy forbids one person from contracting with another for exemption of the former from liability for injury which his negligence may cause to the property of the latter; a contract by which a railway company establishing a switch and shipping point for the proprietor of a private business, at a point where its location is not demanded by the public interest, receives, upon that consideration, an agreement exempting it from liability for fire negligently communicated from its locomotives to the property of such proprietor is not unlawful as conflicting with general public policy or that of the State. (Pp. 476-479.)

**4.—Contract—Assignability—Personal Trust.**

The contract of the owner of a private business, to exempt from liability for fire a railway company establishing a switch for the accommodation of his business, did not involve such personal trust and confidence on his part in the contracting company as to prevent its transfer, to another road purchasing its line, of its rights and exemptions under such contract. (Pp. 479, 480.)

**5.—Railway—Contract—Consolidation—Succession to Rights.**

The Missouri, Kansas & Texas Railway Company of Texas, by its purchase and consolidation with its own of the line of the Trinity & Sabine Railway, under the authority of the Special Act of April 30, 1891, and the General Act of March 28, 1891, assumed the duties of the latter company under its contract with the proprietor of a lumber business for maintaining a switch for its accommodation, and became entitled to the rights and exemptions secured to its predecessor by such contract, since the obligations must be mutual. (Pp. 480-483.)

**6.—Railway—Fire—Negligence—Duty in Selecting Appliances.**

It is not the absolute duty of a railway company to provide its locomotives with the best devices for arresting the escape of sparks; but to use such care as a man of ordinary prudence would exercise, under like circumstances, to select and use the best devices; it is neither liable for a failure of judgment honestly exercised in the attempt to discharge the duty, nor relieved by the fact that the appliances selected, though not the best, are approved and in common use. (Pp. 483-485.)

**7.—Same—Evidence of General Negligence as to Condition.**

Testimony that the engines used by defendant on the line of road in question were generally old, and some of them in bad condition, was admissible on the question of defendant's care in the selection of machinery, though not referring to the particular engine shown to have set out the fire. (P. 486.)

Questions certified from the Court of Civil Appeals for the First District, in an appeal from Polk County.

*James Hagerman, T. S. Miller,* and *Brown, Lane & Garwood (J. M. Bryson,* of counsel), for appellant.—Every obligation of whatever kind or nature resting upon the Trinity & Sabine Company, including its obligation under the said written contract of release, was imposed upon the Missouri, Kansas & Texas Railway Company of Texas by the said legislative acts, and by the deeds authorized by said acts under which that company took unto itself the railroad, properties and franchises of the Trinity & Sabine Company. 2 Blackst. Com., 109; Angel & Ames on Corp., sec. 172; Overseer v. Sears, 22 Pick., 122; School District v.

Everett, 52 Mich., 314; Railway Co. v. Bosworth (Ohio) 38 Am. and Eng. R. R. Cases, 293; 7 Thomp. on Corp., 8239; Railway v. Ashling, 160 Ill., 373; Railway v. Ga., 92 U. S., 665; Railway v. F. L. & T. Co., 49 Ill., 331; Railway v. Hunt, 20 Ind., 457; Meyer v. Johnson, 64 Ala., 656.

From the authorities which we have cited, and which we will hereafter cite, the following rules are clearly deduced:

1. That when one railway company is transferred to another, either by purchase or consolidation, or both, and the Legislature imposes all liabilities and obligations of the selling or merging company upon the purchasing or consolidated company, then that company becomes absolutely responsible for all the personal obligations of the selling or merged company, as well as for all liens and incumbrances.

2. Where legislation authorizes the sale of the railway properties of one company to another, and the grantee company stands in an independent relation towards the grantor company, and pays a valuable consideration, and the Legislature does not provide that the sale shall be subject to the liabilities and obligations of the grantor company, then the grantee company takes the property subject only to valid liens and incumbrances against the property.

3. Where a consolidation is effected, either by the creation of a new company or by the merger of one of the constituent companies into the other, and there is no express legislative direction for the assumption of the liabilities and obligations of the old companies, the law absolutely implies that the consolidated company becomes liable not only for the liens, incumbrances and equities against the constituent companies, but also for all their personal obligations and liabilities.

These rules are well-stated in a recent work by Hirschl on Combination, Consolidation and Succession of Corporations, in chapter 14, page 389.

Where, by the terms of a statute authorizing the sale or consolidation of a railroad, all the rights and privileges of the constituent or selling company are preserved to the buying or consolidated company, then an exemption from taxes passes to the purchasing or consolidated company, as to that property received from the constituent or selling company holding the exemption from taxes. Railway v. Maryland, 10 How., 376-393; Tomlinson v. Branch, 15 Wall., 460; Railway v. Miller, 114 U. S., 176; Railway v. Lambert, 70 Mass., 779; Railway v. Allen, 15 Fla., 637.

The written contract of release was not a contract at all personal in its nature, but bound both parties, their assigns and successors. It was assignable. Railway v. McClure, 81 N. W. Rep., 52.

By its express terms it was a covenant running with the land, and binding upon the assignees of Carter. It was likewise binding on the Trinity & Sabine Company, the same as if the words "its assigns and successors" had been expressly written immediately after the name of that company wherever it appears in the contract. Railway v. Bos-

worth, 38 Am. and Eng. R. R. Cases, 290; Lydick v. Railway, 17 W. Va., 427; Railway v. Kennedy, 20 Am. and Eng. R. R. Cases, 459; Railway v. Fisher, 24 N. E. Rep., 756; Railway v. Priest, 31 N. E. Rep., 77; Railway v. Nittany, 29 Law Rep. Ann., 423; Railway v. McClure, 81 N. W. Rep., 52; Railway v. Reeves, 64 Ga., 492; Sims on Covenants, 206.

If the stipulations contained in the contract did not constitute covenants running with the land, then they constituted reciprocal easements and servitudes in favor of and against the parties thereto and their successors and assigns, whether mentioned or not. Jones on Easements, sec. 1; Simpson v. Mayor of Godmanchester, 1 C. H., 214; Churchill v. Burlington Water Co., 62 N. W. Rep., 646; Storey v. Railway, 90 N. Y., 122; Laher v. Railway, 104 N. Y., 268; Richardson v. Pond, 15 Gray, 387; Gurney v. Ford, 2 Allen, 576; Nunell v. Iron Co., 94 Tenn., 397; 2 Washb. on Real Prop., 303; 6 Am. and Eng. Enc. of Law, 139; McMahon v. Williams, 79 Ala., 288; Kuecken v. Voltz, 110 Ill., 264; Spensley v. Valentine, 34 Wis., 154; 2 Blackst. Com., 109; Angell & Ames on Corp., sec. 172; Overseer v. Seers, 22 Pick., 122; 1 Mora., Priv. Corp., sec. 350; Day v. Railway, 31 Barb., 548; Van Rensselar v. Railway, 62 N. Y., 65; Van Rensselaer v. Railway, 1 Hun, 507; Bushnell v. Proprietors, etc., 31 Conn., 150; Smith's Lead. Cas., part 1, 115-129; Rowbotham v. Wilson, 8 Ell. & B., 123, 92 Eng. C. L. R., 122; Gibert v. Peteler, 38 Barb., 488, 38 N. Y. 165; same case affirmed on appeal, 62 N. Y.; Joy v. St. Louis, 138 U. S., 1; Warner v. Railway, 164 U. S., 418; James v. Fulcord, 5 Texas, 512; Stewart v. Baker, 17 Texas, 417; Anderson v. Powers, 59 Texas, 213; Newell v. Hill, 2 Metc., 180; Goodwin v. Gilbert, 9 Mass., 510; Huff v. Nickerson, 27 Me., 106; Tripe v. Marsey, 39 N. H., 439; Stevens v. Morse, 47 N. H., 532; Midland v. Fisher, 43 Am. and Eng. R. R. Cases, 578; Pipe Line Co. v. Railway, 41 Atl. Rep., 759; Lumber Co. v. Harris, 43 Am. and Eng. R. R. Cases, 573; Jones on Easements, 89-106; Bank v. Segur, 39 N. J. Law, 173; Lidgerding v. Zignego, 80 N. W. Rep., 360; 6 Am. and Eng. R. R. Cases (N. S.), 716; 4 Leading Cases in the American Law of Real Property, 124, 127.

The contract having been made with the Trinity & Sabine Company, and that company afterwards having sold its railroad properties to the appellant, and the owner of the mill having continued to enjoy the use of the side track, switch and station grounds after the conveyance, the same as before, and no new arrangement of any kind having been entered into by and between the new company and the mill owner, the law conclusively presumes that the contract between the old company and the mill owner was continued as between the mill owner and the new company. It is like the case of the holding-over by a tenant under the written contract without any new agreement between the landlord and the tenant. In such case it is conclusively presumed that the holding-over is under the same terms and conditions as the former holding.

Taylor's Landl. and Ten., secs. 22-58; Insurance Co. v. Railway, 74 Mo. App., 89; Dickinson v. Calahan, 19 Pa. St., 227; Smelting Co. v. Belden Co., 127 U. S., 390.

The contract of release was not void as against public policy. The contract was not made by appellant in its capacity as a common carrier, and does not involve the relation of common carrier, and does not limit appellant's liability as a common carrier, nor conflict with the provisions of article 320 of the Revised Statutes. Griswold v. Railway, 57 N. W. Rep., 843; 90 Iowa, 265; Insurance Co. v. Railway, 62 Fed. Rep., 904; same case, 70 Fed. Rep., 201, 70 C. C. A., 62, 175 U. S., 92; Stephen v. Railway, 109 Cal., 86; King v. Railway, 109 Cal., 96; Railway v. McClure, 81 N. W. Rep., 53; Hahn v. Railway, 80 Mo. App., 411; Insurance Co. v. Railway, 74 Mo. App., 89; McAdams v. Railway, 45 S. W. Rep., 936.

The contract of release exempts the railway company from liability for fires negligently caused by its engines. Hartford Fire Insurance case, 62 Fed Rep., 904, 70 Fed. Rep., 201, 175 U. S., 91; Stephens' case, 41 Pac. Rep., 783; McClure case, 81 N. W. Rep., 52; Hahn v. Railway, 80 Mo. App., 411; Insurance Co. v. Railway, 74 Mo., 89; Hosmer v. Railway, 31 N. E. Rep., 652; Johnson v. Railway, 50 S. W. Rep., 563; Cullers v. Railway, 17 S. W. Rep., 19.

The court erred in admitting over defendant's objection the deposition and testimony of T. H. Clegg to the effect that the general condition of all of the engines upon the Trinity & Sabine Division were bad, because there was no pleading that would justify the same, and same was irrelevant and immaterial to any issue in the case, and prejudicial to the rights of the defendant. The same is too vague and indefinite, and the answers should be limited to the condition of the particular engine which it is contended set out the fire, and the evidence as to the condition of other engines is wholly irrelevant and prejudicial to the rights of defendant. And the court erred in failing and refusing to charge the jury as requested in charge No. 11, as follows: "You are instructed that all testimony herein, if any, to the effect that the defendant company was in the habit of using defective engines on the Trinity & Sabine division of its road, is immaterial to any issue of this case, is withdrawn from your consideration, and will not be considered by you for any purpose whatever," because the evidence fully and certainly identified the identical engine which was present at Barnum at the time of the fire as being engine No. 35, and being the only engine from which sparks by any possibility could have been emitted. H. & H. Co. v. Railway, 48 Am. and Eng. R. R. Cases, 16; Inman v. Railway, 35 Am. St. Rep., 232; Railway v. Johnson, 92 Texas, 380; Allard v. Railway, 40 N. W. Rep., 685; Gibbons v. Railway, 17 N. W. Rep., 132; Bell v. Railway, 20 N. W. Rep., 456; Railway v. Osborn, 51 Pac. Rep., 286; Railway v. Wilder, 53 S. W. Rep., 490; M. S. & D. Co., v. Railway, 65 N. W. Rep., 176; Bank v. Railway, 50 N. E. Rep., 1023; Railway v.

Jones, 26 S. W. Rep., 595; Ireland v. Railway, 44 N. W. Rep., 426; Henderson v. Railway, 27 Am. St. Rep., 652.

The trial court erred in failing to give appellant's special charge No. 17, to the effect that the law does not require that the railway companies shall adopt every new invention, as to the utility of which men of equal skill may differ; that the measure of their duty is filled by the use of such appliances as are in general use among practical railroad men, and proven by practical railroad men to be adapted to the purpose intended; and that if the diamond stack is such an appliance, defendant's duty in that regard has been discharged, even though as a matter of fact the straight stack is a better and a more recent device. Flinn v. Railway, 36 N. E. Rep., 1046; Frace v. Railway, 38 N. E. Rep., 102; S. & D. Co. v. Railway, 65 N. W. Rep., 180.

*Feagin & Carter* and *Finley, Ethridge & Knight (J. Holshousen on* brief in appellate court), for appellees.—The contract in question was made by the Trinity & Sabine Railway Company in its capacity of common carrier, and pertains exclusively to matters of shipment and facilities and accommodations therefor, and so much thereof as attempts to exempt the railroad company from damages from fire contravenes public policy and is void. Insurance Co. v. Railway, 175 U. S., 91.

The contract relied upon by appellant was a nudum pactum, because it devolved upon the Trinity & Sabine Railway Company, as matter of law, to provide reasonable means and facilities for receiving the lumber offered by W. T. Carter & Bro. for shipment. Rev. Stats., arts. 4519, 4522; Covington v. Keith, 139 U. S., 128; Insurance Co. v. Railway, 175 U. S., 91.

The contract relied upon by appellant was wholly without consideration, in that the switch in question had been constructed and had been put in actual use and operation several months prior to the execution thereof, and said switch had been so constructed and used without any previous verbal understanding that Carter should execute any contract exempting the railroad company from damages from fire, and Carter's subsequent use of the switch in making shipments of lumber therefrom was but the exercise of a statutory right. Jones v. Holliday, 11 Texas, 415; 1 Pars. on Cont., 7 ed., 455, bottom paging; Smith v. Seymour, 59 S. W. Rep., 816; Gas Co. v. Singleton, 59 S. W. Rep., 920; Gonzales v. Adoue, 56 S. W. Rep., 543 (550); Railway v. Sciacca, 80 Texas, 356; Phifer v. Mansur & Tebbitts Imp. Co., 61 S. W. Rep., 968.

The contract in question was purely personal between Carter and the Trinity & Sabine Railroad Company, and it involved, as one of the essential elements, personal trust and confidence, and same was therefore incapable of assignment by said railroad company to appellant without the assent of Carter. Railway v. Smith, 72 Texas, 122; Brown v. Warner, 78 Texas, 543; House v. Houston Waterworks, 88 Texas, 233; Cameron v. Fay, 55 Texas, 58; Hudson v. Farris, 30 Texas, 574; Nalle v. Paggi, 81 Texas, 201; Edwards v. Bonner, 12 Texas Civ.

App., 236 (247); Sanger v. Warren, 91 Texas, 472; Smelting Co. v. Belden, 127 U. S., 379; Delaware Co. v. Safe Co., 133 U. S., 488; Burck v. Taylor, 152 U. S., 634; Hurd v. Curtis, 36 Mass., 459; Ice Co. v. Potter, 123 Mass., 28; Harsha v. Reid, 45 N. Y., 415; Railway v. Curtiss, 80 N. Y., 219; Simpson v. Brown, 68 N. Y., 355; Nixon v. Zuricalday, 24 N. Y. Supp., 121; Clark v. De Voe, 124 N. Y., 120; People v. Railway, 57 Ill., 436; Ferry Co. v. Railway, 94 Ill., 83; Anderson v. Faulconer, 30 Miss., 145; Lyon v. Parker, 45 Me., 474; Litka v. Wilcox, 39 Mich., 94; Randall v. Chubb, 46 Mich., 311; Railway v. Railway, 6 Law. Rep. Ann., 111; Printing Co. v. Publishing Co., 58 N. W. Rep., 238; Harper v. Dalzell, 27 Law Bul., 274; Burton v. Larkin, 13 Pac. Rep., 398; Smith v. Hollet, 34 Ind., 519; Hardy Imp. Co. v. Iron Works, 31 S. W. Rep., 599; Lansden v. McCarty, 45 Mo., 106; Kelley v. Thuey, 102 Mo., 529; Bozeman v. Bank, 7 Ark., 328; Pearson v. Hartman, 100 Pa. St., 84; Railway v. Webster, 61 S. W. Rep., 1018 (1020); Jones on Easements, sec. 670; 13 Am. and Eng. Enc. of Law, 545, and cases cited.

Appellant did not succeed to the rights of the Trinity & Sabine Railway Company in said contract, even had the same been capable of assignment.   Special Act 22d Leg., 1891; Morrill v. Smith County, 89 Texas, 552; Railway v. Maine, 96 U. S., 509; Railway v. Railroad Commissioner, 41 Ark., 520; Shields v. Ohio, 95 U. S., 319.

Said contract does not, either expressly or by necessary implication, extend the exemption from liability to fires set out as the result of negligence, whereas the fire which resulted in the destruction of appellee's property was negligently set out by appellant, and for this reason the contract affords no defense.

Under the evidence as stated, the trial court did not err in imposing on appellant the duty to equip its engines with the best approved appliances then in use for the prevention or escape of sparks of fire.   Railway v. Levine, 87 Texas, 437; Scott v. Railway, 93 Texas, 625; Campbell v. Goodwin, 87 Texas, 273; Railway v. Johnson, 92 Texas, 591; Railway v. Benson, 69 Texas, 409; Railway v. Horne, 69 Texas, 643; Railway v. Bartlett, 81 Texas, 42.

The court did not err in refusing to give either the thirteenth, sixteenth or seventeenth special charges requested by appellant.   Railway v. Donough, 1 White & W. C. C., 357; Metzger v. Railway, 41 N. W. Rep., 49; Railway v. Nelson, 51 Ind., 150; Steinweg v. Railway, 43 N. Y., 123; Watt v. Railway, 62 Am. St. Rep., 772; 1 Thomp. on Neg., 155; Whart. on Neg., sec. 872; 2 Shearm. & Redf. on Neg., 5 ed., sec. 673; 13 Am. and Eng. Enc. of Law, 493-494; Railway v. Corn, 71 Ill., 493; Wiley v. Railway, 44 N. J. Law, 247; White v. Railway, 38 S. E. Rep. (Va.), 180; Railway v. Rogers, 8 Am. and Eng. R. R. Cases, 710; Railway v. Samuels, 57 S. W. Rep. (Ky.), 235; Railway v. Tyne, 7 Am. and Eng. R. R. Cases, 515; Jackson v. Railway, 31 Iowa, 177.

Appellees were driven to rely upon evidence circumstantial in its character to establish the fact that the fire which resulted in the destruction of their property was set out by one of appellant's engines, and,

such being the case, evidence to the effect that appellant at or about the time of the fire usually kept in its service old engines, some of them in bad condition, was permissible. Wilson v. Railway, 58 S. W. Rep., 183 (185); Railway v. Donaldson, 73 Texas, 126; Railway v. Land, 3 Wills. C. C., sec. 50; Railway v. Newman, 40 S. W. Rep., 855; Bennett v. Railway, 32 S. W. Rep., 835; Dillingham v. Whittaker, 25 S. W. Rep., 724; Campbell v. Railway, 25 S. W. Rep., 936, and cases cited and commented on, pp. 937-8; Railway v. Tripp, 51 N. E. Rep., 833; Railway v. Keith, 35 N. E. Rep., 298, and cases cited; Dunning v. Railway, 39 Atl. Rep., 352; Thatcher v. Railway, 27 Atl. Rep., 519; Railway v. Lewis, 51 Fed. Rep., 664; Railway v. Johnson, 54 Fed. Rep., 475-6; Sheldon v. Railway, 14 N. Y., 218; Railway v. Hesters, 90 Ga., 11; Ross v. Railway, 88 Mass., 87; Davidson v. Railway, 34 Minn., 51; Field v. Railway, 32 N. Y., 339; 13 Am. and Eng. Enc. of Law, 2 ed., 520, and cases under note 3; Koontz v. Railway, 20 Ore., 3; 2 Shearm. & Redf. on Neg., 2 ed., sec. 675; 1 Thomp. on Neg., 159.

BROWN, Associate Justice.—The Court of Civil Appeals for the First Supreme Judicial District has certified to this court the following statement and questions:

"We respectfully propound for your decision the questions hereinafter set out which have arisen in this cause now pending before this court on appeal.

"The partnership of W. T. Carter & Brother, composed of W. T. Carter, E. A. Carter, and Jack Thomas, owned and operated a sawmill and planing plant, together with the land, houses, stores, machinery, and other property appurtenant thereto, and owned the real estate on which it was situated. The property was situated in Polk County, Texas, near and adjoining the right of way of the Trinity & Sabine Railroad. At the time of the establishment of the sawmill, etc., at that point, the railroad was owned and operated by the Trinity & Sabine Railroad Company, a Texas corporation. The road was about sixty-seven miles in length and extended from the town of Trinity, Texas, through Polk County to Colmesneil, in Tyler County, Texas.

"The Trinity & Sabine Railroad Company continued to own and operate its road until the 30th day of January, 1892, when the Missouri, Kansas & Texas Railway Company of Texas, also a Texas corporation, purchased all the properties of the Trinity & Sabine Company and took a deed therefor. This purchase was made under the authority and powers conferred by the special Act of the Legislature, April 30, 1891, and the general Act of March 28, 1891. The appellant from the date of the purchase owned and operated the Trinity & Sabine Railroad as a part of its system.

"On the 9th day of August, 1897, W. T. Carter & Brother owned and were still operating the mill and properties before mentioned and had accumulated a large quantity of lumber, a part of which was stacked on

the right of way of the railroad company at the point on the road where the mill was situated.

"The partnership had also built on the right of way a shed 300 feet long and 40 feet wide in which was stacked and stored on the last named date a large quantity of kiln-dried lumber. On August 9, 1897, fire was discovered on or in the shed near the east end thereof at a point 60 or 65 feet from a side track on which one of appellant's engines had been used for switching about 30 minutes before the discovery of the fire. As a result of this fire, the entire mill plant, lumber and other property was consumed with the exception of a small amount of salvage. The lumber and sheds were on the right of way with the assent and acquiescence of appellant. At the time of its destruction, appellees, Carter & Brother, were carrying fire insurance to the amount of $22,000, the risk being distributed among the several insurance companies parties to this suit.

"The insurance companies paid the amounts for which they were liable under their several policies, and having, by assignment or by subrogation clauses in the policies, themselves acquired an interest in the claim of Carter & Brother against any person or concern responsible for the fire and its consequences, joined Carter & Brother in this suit to hold the appellant company liable therefor on the ground that the fire was negligently set by sparks from one of appellant's engines.

"Appellant answered by general demurrer, general denial, and special pleas whereby it set up in defense:

"1.   That appellees, in stacking their lumber on and near the right of way, assumed the risk of fires due to negligence of appellant in equipping and operating its engines.

"2.   That appellees were guilty of negligence in placing combustible material so near the track and in failing to provide adequate protection against fire; and

"3.   That Carter & Brother had, in consideration of the building of the switch near the mill for their convenience in shipping lumber therefrom, executed a written contract with the Trinity & Sabine Railroad Company in 1883, whereby they agreed to release the railroad company from all responsibility for fires caused by the operation of their engines at and near that point, and that this contract by its terms and nature passed to the appellant company by reason of its purchase of the properties of the Trinity & Sabine Railroad Company and was an effectual bar to appellees' demands.

"On the trial before the court and jury, evidence was adduced by plaintiff showing that engine No. 35 of appellant (which had never belonged to the Trinity & Sabine Railroad Company), was switching on the side track within 65 feet of the point of the fire about 30 or 40 minutes before the fire was discovered. They adduced testimony to the effect that the engine in question was of an old and discarded pattern as to the spark-arresting device, and adduced circumstantial evidence tending to show that the spark-arresting device was not in good condi-

tion, and that the engine, while switching at the point in question, was negligently handled. They also adduced circumstantial evidence tending to show that the fire could not probably have originated from any other known source than defendant's engine.

"Appellant's evidence tended to show other causes as the probable source of the fire. That the course of the wind was from the fire toward the engine. That the smoke from the engine actually blew away from instead of toward the fire, and that its spark-arrester was an approved device in good condition.

"The contract of release from responsibility was shown to have been lost, and while some testimony was offered in an effort to show that it contained a clause of release as alleged, the evidence was not sufficient to present the issue as against the appellees' plea of non est factum.

"The cause was submitted to the jury and resulted in a verdict and. judgment in favor of appellees for $150,000 and interest.

"The contract of release from liability was discovered by appellant after verdict and was appended to its motion for new trial and made one of the grounds on which a new trial was sought. It was the original actually executed by W. T. Carter. Its date was 3d day of May,. 1883. The other party thereto was the Trinity & Sabine Railroad Company.

"The contract is as follows:

" 'Whereas, W. T. Carter of the county of Polk, State of Texas, owns. a steam sawmill and fixtures which is located in the county of Polk,. State of Texas, on a tract of land described as follows, to wit: Ira. Conway league in said. Polk County, being about (70) seventy feet from the main track of the Trinity & Sabine Railway Company; and

" 'Whereas, the said W. T. Carter, for his convenience in shipping lumber and other freight, has petitioned the said Trinity & Sabine Railway Company to construct a side track and switch at a point between stations 2600 and 2609, east from Trinity station and about twenty miles east from Groveton station; and

" 'Whereas, in consideration of the stipulations hereinafter contained,. the said Trinity & Sabine Railway Company has agreed, and by these presents does agree, to construct the said side track and switch at said point, which switch shall be known and called Barnum.

" 'Now, therefore, in consideration of the premises, and the construction of the said side track and switch by the said railroad company, I, the owner of said mill, hereby release the said Trinity & Sabine Railway Company from any and all damages and claims arising from the injuring or killing of any stock or cattle belonging to me or my contractors or employes that may be injured or killed by the locomotives, trains or cars of the said railroad company on the line of said road or any of its tracks, and from all damages resulting from the injury or destruction of any property whatever that may be injured or destroyed by fire or sparks from any locomotive of said railroad company at or-

about said Barnum switch belonging to me, my employes, or contractors in and about said mill, and in the event the said railroad company shall be made liable for any damage done by it to any cattle, stock, or property belonging to any of my contractors and employes as aforesaid, then I bind myself and assigns to reimburse said railroad company for any money they have to pay therefor, including all costs of court, and I hereby agree that the claim against us for such money so paid by said railroad company shall be a lien on said mill and its fixtures, as also on the premises on which the same is located. It is understood that the stipulation herein contained shall be a covenant running with the said land and mill, and in the event I shall assign, transfer, or lease said premises, then the stipulation herein contained shall be binding on my assigns or lessee. The said railroad company reserves the right to take up said track and switch whenever they may deem it proper upon giving —— days notice to the occupant of said mill. May 3d, 1883.

(Signed)        " 'W. T. Carter.'

"Though the contract was executed by W. T. Carter alone, no question is made but that it was equally binding upon his copartners.

"Appellees contested the motion for new trial, and, in so far as it was sought upon this ground, urged that as the release was made between Carter and the Trinity & Sabine Railroad Company, appellant was a stranger thereto, and that it was not assignable without the consent of Carter & Brother, and no such assent was shown.

"Appellees also filed affidavits to the effect that the switch, the construction of which purported to be the consideration moving Carter to the execution of the release, had been actually constructed by the company and was in use by Carter & Brother two or three months prior to the date of the release, and the contract was therefore void for want of consideration.

"Appellant filed no controverting affidavits, but the proof adduced upon the trial of the cause showed that whatever the nature of the agreement between Carter & Brother and the Trinity & Sabine Railroad Company, it was in force at the date of purchase by appellant of the properties of the above named road. It further appeared that appellees, Carter & Brother, continued to use the switch from the date of appellant's purchase until the fire, and enjoyed the benefits of the construction and maintenance of the switch.

"There appeared to be no difference between the course of dealing between the Trinity & Sabine Company and Carter & Brother and the appellant and Carter & Brother in so far as the use of the switch was concerned, nor was anything ever said or done either by appellant's agents or Carter & Brother, by which the agreement embodied in the lease was abrogated. Appellant continued to maintain the switch, and its use for the mutual benefit and convenience of the railroad and Carter & Brother continued unchanged until the fire occurred.

"The facts of the situation at that point were not such as to impose

on the railway company the duty to construct or maintain the switch as a part of its obligation to the public.

"The affidavits showed that the release was not executed in pursuance of any previous verbal agreement.

"Appellant showed such diligence in its effort to discover the original of the release as would have entitled it to a new trial should it be held that the release, if adduced upon the trial, would have operated as a bar to this action.

"Questions Propounded: 1. Was the contract of release void either as against public policy or for want of consideration?

"2.   Was it assignable?

"3.   Could it in any aspect of the case be successfully invoked by appellant as a bar to plaintiffs' actions?

"Appellant introduced evidence on the trial tending to show that the 'diamond stack,' nonextension spark-arresting device was among the most efficient in use for the purpose; that it was equally as good or better than the extension front, straight stack device. That it was so generally regarded by practical railroad men skilled in such matters, and that while the extension front, straight stack was in more general use among railroads than the diamond stack, yet the more general adoption of the straight stack, extension front was not due to the fact or the belief that it was a more efficient device for the prevention of escape of sparks or fire, but its adoption was due to other considerations. That the netting which really controlled the size of sparks emitted was of the same size mesh in each of the different devices named.

"Engine No. 35, which was the only engine shown to have been in proximity to the point where the fire originated, was shown to have been equipped with the nonextension, diamond stack device.

"Appellees' evidence tended to show that the straight stack, extension front, was the later and better device in general use for the prevention of the escape of sparks and fire, and that the nonextension, diamond stack, went out of general use in Texas between the years 1880 and 1885.

"The court charged the jury to the effect that it was the duty of appellant to equip its engines with the best approved spark arresting device in use,   *   *   *   and that a failure to do so would render it liable for the consequences of the fire if the fire was shown to be due to such failure on the part of appellant.

"On this phase of the case, appellant requested the three special charges hereinafter set out.

" 'No. 13.   A railroad company is not bound to adopt any particular kind of appliances or machinery for the prevention of fires, nor is it required to adopt every new invention, even though it has the highest scientific approval, nor is it bound to at once discard its machinery and appliances and adopt new and better ones which are coming into general use, but it is its duty to use such approved appliances as are in general use among reasonably skillful and prudent railway men. Hence

you are instructed that, although you should believe that what is known as a straight stack, extension front engine is a more recent or a more perfect device for the arresting of sparks and preventing the setting out of fires than the diamond stack, nonextension boiler, shown to have been in use upon defendant's engine at the time the fire is alleged to have been set out, yet if you should further find from the evidence that such diamond stack, nonextension boiler is an approved appliance for the arresting of sparks in the operation of engines, and that such appliance is in general use among railroad men of reasonable care, prudence and skill; that at the time of the alleged injury such engine was provided with such appliances, that they were in good repair, and that said engine was at the time of the fire operated in a reasonably careful and prudent manner by competent employes, then, in that event, you will find for the defendant, even though you should believe that defendant's engine set out the fire.'

" 'No. 16. You are charged that railroads are authorized and permitted by law to run their trains upon their tracks propelled by steam generated by fire, and they are authorized to use all reasonable means which will permit them to carry out the purposes for which they are created. They are permitted to use fire in their furnaces and are not to be restricted in their operation or be made liable because sparks of fire may be emitted from their engines. They are required to keep their engines and appliances in good order and handle them with reasonable care and skill and to use and keep in good order such appliances as experienced and practical railroad men may determine are among the best to prevent the escape of sparks and fire.'

" 'No. 17. Railroad companies are authorized and empowered by law to operate their trains, and in so doing to use fire and steam, but they are also required to use due and reasonable care to prevent injury to the property of others. Reasonable care does not require the adoption of every new invention or contrivance which science may or can suggest as to the utility of which men equally skilled may differ. They fulfill the measure of their duty in this respect by adopting such appliances and contrivances as are in practical use by well-regulated railroad companies, and which have been proved by experience to be adapted to that purpose. Hence, in this case, although the jury may believe from the evidence that the straight stack, extension front boiler is a later and a better device than the diamond stack, nonextension boiler, or that a combination of the diamond stack extension boiler is a later and better device than the diamond stack nonextension boiler for the arresting of sparks and preventing the setting out of fires, yet, if they should believe that the diamond stack, nonextension boiler is in practical use by well-regulated companies, and that it has been proved by experience to be adapted to that purpose, and that defendant's engine at the time of the injury being provided with such appliances, the same being in good order and repair, and that such engine and appliances were operated at said time with reasonable care and prudence by competent em-

ployes, then, in that event, they will find a verdict for the defendant,. even though they might believe from a preponderance of the testimony that the fire was actually set out by the defendant's engine.'

"Questions. 4. Under the evidence as stated, did the trial court err in imposing on appellant the duty to equip its engine with the *best approved appliances then in use* for the prevention of escape of sparks and fire?

"5. Did the court err in refusing to give either of the special charges. above mentioned?

"6. Are railway companies required at their peril to select and equip, their engines with the *best* appliances in use and approved by railway companies, even though it should appear that persons equally skilled in. such matters differ as to the relative merits of such devices?

"The trial court, over the objection of appellant, permitted the witness Clegg to testify in behalf of appellees, as shown by the following bill of exceptions, which also shows the nature of the objection urged. The only engine which could possibly have set out the fire had then been identified as engine No. 35, and appellant had adduced no proof as to the condition of its other engines. No testimony was offered to show that engine 35 had ever thrown sparks or set out fires prior to the date of the fire in question. After the evidence was closed, appellant, by special charge, requested the court to exclude it on the ground that it was immaterial and the court refused to do so. Only three engines were in. use on that division of defendant's road at the time of the fire. The bill of exception is as follows:

" 'Be it remembered that upon the trial of the above numbered and entitled cause, the plaintiff offered to prove by the deposition of T. H. Clegg the following facts, to wit: 'The defendant company usually kept in service on the Trinity and Sabine division old engines; apparently some of them were in ordinary condition and some of them were in. bad condition. I know their condition from having seen them daily and from having worked frequently on them.' This testimony was objected to by the defendant upon the ground that it seeks to prove the condition. of other engines at an indefinite time before and after the fire, giving the general *custom* as to the use of bad engines on a particular branch of defendant's road; and there are no allegations of that kind in the petition charging the defendant with the general use of bad engines and locomotives on that branch of its road, and there was nothing to advise the defendant of this issue. The objection was overruled and the testimony admitted by the court, to which ruling the defendant excepted,. etc.'

"Questions. 7. Was the testimony admissible as against the objection urged as shown by the bill of exceptions?

"8. Should the court have given the requested charge excluding it?"'

To the first question we answer: The contract is not void as being against public policy of the State nor for want of a sufficient consideration.

Upon that portion of the question which submits the validity of the contract for want of consideration, we will state that our answer is limited to the contract itself, as we do not feel authorized to pass upon that question on the ex parte affidavits presented by the appellee on the motion for rehearing. The appellant had the right to submit the contract and the issue of consideration arising upon it to a jury for determination, and if this court should undertake to decide the question in the present state of the record, we would be denying the appellant its constitutional right to have a verdict of the jury upon every material issue in the case, when properly presented. The fact that the contract was not in evidence on the trial can not affect this question; sufficient reason was shown why it was not produced at that time. The recitals in the contract show the consideration to be the establishment by the railroad company of a switch at the given point for the convenience of the appellees and not to remove it except upon reasonable notice given to the appellee of the intention to do so, and an implied and legal obligation to maintain the switch in good condition and to furnish cars when demanded by appellees, as well as to receive and discharge freight at that point. These were valuable rights secured to the appellees by the contract and constitute sufficient consideration to support it.

Counsel for appellee have discussed the question of the validity of the contract under the view that its terms constitute a limitation upon the common law liability of the railroad company as a common carrier, therefore it is prohibited by article 320 of the Revised Statutes. If that contention can be sustained, the contract must be held to be invalid, at least to the extent that it contravenes the provisions of that statute. The certificate does not in terms submit the question, whether the contract is a limitation of the common law liability of the railroad company as a common carrier, but we believe that it is proper, under the facts stated and the question submitted, to answer with reference to the statutory provision, and the public policy of the State. In determining the meaning of the contract, we must construe the language which is claimed to constitute such limitation in connection with the body of the instrument and in the light of the circumstances in which it was made. The appellees sought to have a switch put in upon the line of the appellant's railroad so as to enable appellees to ship lumber from and other things to that point. The putting in of the switch would cause the building of the mill, which would bring together a number of persons as contractors and laborers, with live stock to be used in connection with the business, and cause the accumulation of lumber and combustible matter near the railroad track,—all of which would increase the probability that the railroad company might incur liability for damages on account of the injury to or destruction of such property in the operation of its trains "at and about the switch." In order to induce the construction of the switch, in view of these facts, this provision was inserted in the contract: "Now, therefore, in consideration of the premises and of the construction of said side track and switch by the said railroad com-

pany, I, the owner of the said mill, hereby release the said Trinity & Sabine Railway Company from any and all damages and claims arising from the injury or the killing of any stock or cattle belonging to me, or my contractors of employes, that may be injured or killed by the locomotives, trains or cars of the said railroad company on the line of the said road or any of its tracks, and from all damages resulting from the injury or destruction of any property whatever that may be injured or destroyed by fire or sparks from any locomotive of said railroad company at or about said Barnum Switch, belonging to me, my employes or contractors in and about the said mill."

The language, taken in connection with the purposes of the contract and the surrounding circumstances, seems to refer to such property as the appellees and their contractors and employes might own and be using about and near to the switch, and is not apt, if it was intended to include property in the possession and under the control of the railroad company as a common carrier. In order to bring the contract within the terms of the statutory prohibition, it must embrace property for which the railroad company would be liable, as common carrier, at the time of its destruction; the terms of the contract do not embrace property for which the railroad company could be held liable as common carrier; therefore it is not within the statutory inhibition. It is a sound rule of construction that a contract should be so interpreted, if fairly susceptible of it, as to make it legal and to accomplish the purposes of the parties; but the construction which counsel for appellee contend for would make the agreement illegal and defeat the purposes for which it was made.

The most important question certified arises out of the proposition of appellee's counsel that the contract is contrary to the public policy of the State and therefore void. In the case of Printing and N. R. Co. v. Sampson, 19 Eq. Cases (L. R.), 465, the court said: "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract." The power to make contracts is too valuable a right to be lightly swept away under the general declaration that such contracts are contrary to public policy, and we must come to some definite point of understanding what the public policy offended against consists of. Under the facts in this case, we must ascertain the public policy of the State as to protection from fire by railroad companies, from the decisions of the Supreme Court, there being no statute on the subject.

In some instances, courts have spoken upon the subject of contracts against the negligence of the contracting parties as if there was a general rule of public policy which forbids persons to make contracts by which

one would be exempted from or indemnified against the consequences of his own negligence, or that of his servants or agents; but we have not been able to find any sound authority for such a proposition; in fact, the body of judicial decisions establishes the contrary doctrine, for it is unquestionably true that in matters of life, accident, and fire insurance, the contract is made with a view of indemnifying the insured party against the results of his own negligence, as well as against the negligence of his servants. Insurance Co. v. Erie Tran. Co., 117 U. S., 312; Insurance Co. v. Compress Co., 133 U. S., 388. A railroad company when not contracting in its character of common carrier has the same right of contract as other corporations or persons, and in many instances may make contracts for immunity from liability on account of the negligence of itself and servants; for example, in case of a failure to fence the right of way when, by contract, released from damages on account of injury to or killing stock in consequence of such failure, the courts have held, generally, that such contracts are valid to the extent of the interest of the adjacent landowner. Railway v. Waterson, 4 Ohio St. (N. S.), 434; Railway v. Smith, 26 Ohio St., 124.

Likewise a railroad company may contract with an express company for exemption from liability for injuries to its goods or its agent in charge of them, although the injuries may be caused by the negligence of its servants; because the contract of carriage is not that of a common carrier. Railway v. Keefer, 146 Ind., 21; 58 Am. St., 348; Express Cases, 117 U. S., 1.

Such a corporation may likewise by contract secure immunity from liability for damages caused by the negligence of its servants in operating locomotives, whereby fire is set to property upon the right of way leased to persons for occupancy and the conduct of private business thereon. Insurance Co. v. Railway, 175 U. S., 91; Railway v. McClure, 81 N. W. Rep., 52; Griswold v. Railway, 57 N. W. Rep., 843; Stephens v. So. Pac., 29 Law. Rep. Ann., 751; Insurance Co. v. Railway, 74 Mo. App., 89.

These cases certainly establish the proposition that there is no general public policy which forbids the making of a contract, whereby one of the parties may secure exemption from the consequences of his own negligence or that of his servants, and they establish that in the class of cases cited it is legitimate to make such contracts. The only material difference between the cases last cited and this is that in those the railroad companies leased to other parties a portion of their right of way authorizing such parties to conduct thereon a business, which would supply freight for shipment upon the railroad from that point. This contract does not provide that the appellees may carry on business upon the right of way, but has in view the establishment of a convenience by which the appellees would be enabled to use their adjacent property to advantage; and also to enable them to ship lumber, manufactured at that point, over the said railroad to other points in the State. We can see no reason why the contract, in this case, should be forbidden that does

not apply with equal force to the cases cited. There being no general rule of public policy which will condemn this contract, the inquiry then arises, is there in the State of Texas any such policy indicated, either by statutory provision, its Constitution or judicial decisions, as would establish a right in the public inconsistent with the terms of this contract?

The decisions of this court establish that railroad companies must equip their locomotives with the best approved appliances for preventing the escape of fire. Railway v. Horne, 69 Texas, 646. Indeed, our court has created an exception to the general rules of evidence by which proof of the fact that fire from a locomotive set fire to adjacent property constitutes a prima facie case of negligence on the part of the railroad company; and devolves upon it the burden to prove that its locomotive was equipped in the manner required by law and carefully operated. The decisions are as potent to establish the policy of the State as if the same principles and requirements had been embodied in a statute, and it may be safely said that it is the public policy of this State that railroad companies, as a protection to property situated near their track, shall provide the best approved devices in use for the prevention of the escape of fire from their locomotives. If the contract certified contravenes that policy, then it must be held to be void. In order for the contract to violate the public policy of the State, the subject of it must be such as that policy applies to; for if the relations of the parties be different the same rules of law will not govern them. This public policy of the State relates to conditions which arise out of the construction and operation of railroads and out of the pursuits of business in its vicinity; but the parties in this case established by their contract a switch where none was required by the existing conditions of business or for the public use, and it was established solely for the promotion of the private interests of the appellees, to develop at that place a business out of which would arise increased risks to the railroad company in the operation of its locomotives. By the terms of the contract the exemption from liability is limited to such property as might belong to appellees situated at and about the switch, for which the railroad company was not responsible as a common carrier. The contract does not provide that the railroad company may relax its diligence in the equipment of its locomotives, nor does it exempt the railroad company from liability for damages occasioned to the property of others at and about the switch, but the same diligence in equipping the locomotives and the same care in operating them was required as to property of all other people as would have been if the exemption had not existed. It is true that the appellees bound themselves to indemnify the railroad company against damages which might occur to property belonging to contractors and employes of the appellees; but the contract does not purport to exempt the railroad company from responsibility to the owners of such property. We conclude that the contract certified is not violative of the public policy of the State, but is a legitimate exercise of the liberty of contract by which the appellees voluntarily, and for the purpose of securing the convenience of the railroad

:at that point, agreed to release the railroad company from liability for injury which might occur to their property by the negligence of the employes of the railroad or by such unavoidable accident as is frequent by the escape of fire from the best equipped machinery. This conclusion is in harmony with the decisions of the Supreme Court of the United States and the current of judicial decisions of the several States. Espe-·cially is it supported by that class of decisions which holds that railroad ·companies may, by contract, relieve themselves of liability for injuries ·occasioned to the property of express companies or to their messengers when carried upon passenger trains, although such injury may arise ·through the negligence of the railroad employes. Express Co. Cases, 117 U. S., 1. The agent of an express company, while riding upon the same train with passengers and liable to the same dangers, occupies a different relation to the railroad company, when, by the terms of the contract, the railroad company is released from liability to such agent or servant ·of the express company. The express company cases before cited are thoroughly analogous in principle to this case and establish clearly the ·distinction which exists between contracts limiting the liability of railroads as common carriers and contracts by which they are permitted, in the matter of carrying the property and messengers of the express company, to contract for exemption, and out of this difference, different duties arise and different responsibilities rest upon the carrier. If a railroad company may by contract change its liability as to a special class of property or persons, then, by a greater reason, they would be authorized to make such contracts, as in this case, which apply to a given locality and particular circumstances.

The second and third questions read as follows:

"2. Was it assignable?

"3. Could it, in any aspect of the case, be successfully invoked by appellant as a bar to plaintiff's action?"

To both of the questions, we answer that the Missouri, Kansas & Texas Railway Company of Texas, after the consolidation, had all of the rights under the contract that the Trinity & Sabine Railway Company would have had under like conditions.

The appellees urge that the contract certified to us is personal in its nature, involving a personal trust and confidence in the Trinity & Sabine Railway Company; therefore not assignable, and that it did not pass to the appellant by the act of the Legislature. There is nothing in the subject of the contract indicating that one railroad company could not fulfill its obligations as well as another, and there does not appear, from the terms of the contract, to have been any relation of trust or confidence between the appellees and that particular railroad company. The contract contains no language indicating an intention of the parties that it should not be transferred to another. Article 308, Revised Statutes, is in this language: "The obligee or assignee of any written instrument not negotiable by the law merchant may transfer to another by assignment all the interest he may have in the same." This statute is ex-

pressed in terms broad enough to embrace the present contract. In the case of Lakeview Land Company v. San Antonio Traction Company, 66 Southwestern Reporter, 766, 95 Texas, ante, page 252, this court had under consideration a contract very similar to the one submitted in this case; and we held that such a contract was assignable by the parties thereto. By the same rule, the contract in this case under our statute would be assignable by the railroad company in case of the sale of its property to another corporation, and being so assignable, the Legislature might by the terms of consolidation impose its obligations upon the new corporation and give to the latter the benefits of its provisions. We deem it unnecessary to enter into an extensive discussion of this question, but we refer to the case last cited and the authorities cited therein in support of our conclusion that the contract under examination is such as might be assigned under our statutes.

Counsel for appellee insist with much earnestness and ability that under the general and special acts of the Legislature by authority of which the consolidation was made, the Missouri, Kansas & Texas Railway Company of Texas acquired only the physical properties of the Trinity & Sabine Railway Company. It is unnecessary for us to follow the able counsel on both sides in their discussion of the effect of consolidation where there is no statutory provision specifying the rights and obligations of the new company, because the general and special laws under which this consolidation was effected plainly limit and prescribe the right and duties of the new corporation, which reduces the question to a construction of the language of those statutes. In order to understand the terms of the statutes, it is necessary to briefly state the circumstances under which the laws were passed. The Missouri, Kansas & Texas Railway Company, a foreign corporation, organized under the laws of the State of Kansas, had been permitted by an act of the Legislature to carry on its business in Texas, being by the said act granted certain rights, powers, and privileges in pursuance of which that company had constructed some railroads in this State in its own name, and had acquired by purchase and otherwise control over and ownership of a number of railroads operating under charters and under other names; and the said foreign corporation was engaged in operating the several railroads, which are mentioned in the special act hereafter referred to. The State of Texas claimed that the purchase, ownership, and control of the other railroads was in violation of the Constitution and laws of the State of Texas, and that no such power had, by this State, been granted to the said foreign corporation. Upon these grounds the State instituted a suit to forfeit the rights of the Missouri, Kansas & Texas Railway Company to carry on business in Texas and to dissolve the combination existing between it and the other railroad companies. A compromise was effected between the State and the foreign corporation whereby the corporation was required to convey all of its railroad properties in Texas, mentioned in the special law, to a corporation to be created under a general law of the State, which was enacted at the same

time; and a special act was passed by the Legislature, which in its preamble recites in full the facts which we have stated briefly, and in the body of the special act the terms upon which the new corporation, when organized, should receive the properties from the several railroad companies mentioned, are specified in full. As pertinent to the issue under discussion, we copy from the special act as follows:

"Section 1. That the Missouri, Kansas & Texas Railway Company be, and it is hereby authorized and empowered to transfer, sell, and convey, all and singular, the railway property, tracks, side tracks, depots, right of way and all property and property rights within this State, acquired, controlled, or held by it, or in its name, by purchase, construction, or otherwise; and which sale and conveyance to be made under the power herein given, shall be to some railway corporation, company, or association of persons, to be incorporated under the laws of this State for the purpose of acquiring, owning, maintaining, and operating the railways so purchased as one property.

"Sec. 2. The sales to and purchase by the said Missouri, Kansas & Texas Railway Company of the several lines of railway within this State, from the railway companies hereafter mentioned, and which lines have been heretofore operated by or as the property of the said Missouri, Kansas & Texas Railway Company, or as a part of the system of railroads within this State known as the Missouri, Kansas & Texas Railway, are hereby authorized, approved, ratified, and confirmed, and the consent of the State is hereby given thereto.

"Sec. 3. The sale herein authorized to be made shall be subject to all just and legal incumbrances, suits, or actions for damages or rights of way, liens, judgments and debts given, contracted, or incurred by said Missouri, Kansas & Texas Railway Company and other companies herein mentioned, upon or against the said properties or any part thereof, as well as to the payment and discharge of all and singular the legal obligations and liabilities of every sort whatsoever against the Missouri, Kansas & Texas Railway Company and properties herein mentioned."

At the same session of the Legislature and within a few days of the time when the special act was passed, the Legislature of Texas enacted a general law entitled "An act to provide for the incorporation of railway companies, for the purpose of acquiring, owning, maintaining, and operating any line or lines of railway within this State, authorized by law to be sold, and to empower such companies, when so organized, to purchase and extend.

"Section 1. Be it enacted by the Legislature of Texas: That whenever any line or lines of railway or railway properties within this State are by special law authorized to be sold and conveyed, the persons contemplating or engaging for the purchase thereof may be formed into a corporation for the purpose of acquiring, owning, maintaining, and operating such line or lines of railway, by complying, as far as is applicable with the requirements of chapter one (1) of title eighty-four

(84) of the Revised Statutes of this State.  *  *  *  And when such corporation has been formed, it shall have the power to purchase, acquire, own, maintain, and operate such line or lines of railway, and properties pertaining thereto, and all other rights, powers, and privileges given by the laws of this State to railway companies, including the right to complete and extend such line or lines of railway and to construct branch lines thereto, and any proposed extension or branch lines may be provided for and included in the original article of incorporation, or the same may, by amendment thereto at any time thereafter, be projected and provided for by such company.

"Sec. 2.  Every railroad company organized under the preceding section of this act shall take the property so purchased subject to all incumbrances, judgments, claims, suits, claims for damages and for right of way against the old company, and subject to all debts and claims for damages accruing against any receiver which may have been appointed for the old company, to the same extent that such property would have been liable in the hands of the railroad company from which it was purchased."

We have copied thus extensively from the two acts under which the consolidation was had, because they show the purpose of the Legislature to have been that all of the old corporations, controlling the properties named, should be merged into the new corporation to be formed, and that all of the property of the existing corporations should be vested in the new and all of the liabilities, contracts, and obligations of the existing corporations should be assumed and discharged by the new.  The following language contained in the special act, as above quoted, applies to the question under consideration:  "The sale herein authorized to be made shall be subject to all just and legal incumbrances  *  *  *  as well as to the payment and discharge of all and singular the legal obligations and liabilities of every sort whatsoever, against the Missouri, Kansas & Texas Railway Company and properties herein mentioned."  The Trinity & Sabine Railway Company was one of the corporations mentioned in the special act as merged into the new company by the consolidation.  What obligations did the contract between Carter & Brother and the railroad company impose upon that company?  The railroad company agreed to put in the switch at the place designated, and having done that, not to remove it without reasonable notice to the appellee.  The switch was put in for the purpose of enabling Carter & Brother to ship lumber from that point and to ship freight from other places to that point.  Out of the terms of this contract there arose, by implication, an obligation on the part of the railroad company to maintain that switch in reasonably good condition for use and to furnish cars at that point for the shipment of freight, and to receive and ship freight from that point, and to likewise transport and deliver freight destined to the same place until the switch should be removed, after reasonable notice, in accordance with the terms of the contract.  By the terms of the consolidation, as specified in the law quoted above, the appellant as-

sumed those obligations and was substituted for the Trinity & Sabine Railway Company. It was bound to perform all of the duties to the appellees that might have been demanded by them of the Trinity & Sabine Company. Pullman Car. Co. v. Railway, 115 U. S., 594. The Missouri Pacific Railway Company made a contract with the Pullman Car Company, by which the railroad company agreed to haul over its railroads the cars of the Pullman company. Under a statute of the State of Missouri the Missouri Pacific Company was consolidated with the Iron Mountain & Southern Railroad Company. The terms of the Missouri statute are very similar to those of our statute. The new corporation took the name of the Missouri Pacific Railway Company, and subsequently litigation arose between the Pullman Company and the railroad company, in which it was held by the Supreme Court of the United States that the new corporation was bound to carry out the contract to haul the cars over the road which the old Missouri Pacific Company owned at the time the contract was made. That case is well in point in the construction of the language of our statute, and supports our conclusion that under the terms of the statute the duty to maintain the switch and to receive freight and deliver it to appellees at that point was assumed by the appellant. After the formation of the new corporation it continued the switch in existence as before, and recognized all the rights of appellees therein by receiving and transporting lumber from that point and delivering freight to them at the switch; and at the time of the fire by which the property was destroyed, the appellant was engaged in the discharge of obligations which rested upon it by reason of the contract made between Carter & Brother and the Trinity & Sabine Railway Company. The effect of substituting the appellant for the Trinity & Sabine Railway Company in the contract was to give the appellant the full benefit of that contract, as well as to charge it with the performance of its obligation, for it is a well-settled principle that the obligations of contracts must be mutually binding upon the parties. Bangor Furnace Co. v. Magill, 108 Ill., 656; Lewis v. Insurance Co., 61 Mo., 534. If the Trinity & Sabine Railway Company had been operating the locomotive at the time the fire was set, then the terms of the contract would have exempted that company from liability, and the appellant being bound only as the Trinity & Sabine Railway Company would have been, and being entitled to all the benefits that the former company would have had under the contract, is also, by its terms, acquitted of liability for the damages caused by the fire.

The fourth, fifth, and sixth questions submitted are as follows:

"4. Under the evidence as stated, did the trial court err in imposing on appellant the duty to equip its engine with the best approved appliances then in use for the prevention of escape of sparks and fire?

"5. Did the court err in refusing to give either of the special charges above mentioned?

"6. Are railway companies required at their peril to select and equip their engines with the best appliances in use and approved by railway

companies, even though it should appear that persons equally skilled in such matters differ as to the relative merits of such devices."

To all of these questions we answer that the trial court committed error in the charge given under the facts of this case in failing to instruct the jury that it was the duty of the railway company to use ordinary care to provide its engines with the best approved devices for preventing the escape of sparks and fire therefrom, and the court did not err in refusing the special charges which were asked.

The charge of the court presents the law applicable to a case in which the question is the character of the spark arrester required by law, but under the facts of this case the charge given failed to submit an important issue,—the question of diligence in the selection of the apparatus. The testimony in this case tended to prove that each of two different kinds of spark-arresters was used by railroad companies and each was considered by experienced railroad men as better than the other, which produced a condition in which it was necessary for the railroad company to make a choice between the two. Under this state of facts, it was the duty of the railroad company to exercise ordinary care,—that is, such care as a man of ordinary prudence would exercise under like circumstances to select and use the better of the two, but, having used such care as the law requires, it can not be held that a failure of judgment honestly exercised in an attempt to discharge the duty should render the company liable. Turnpike Co. v. Railway, 54 Pa., 350; Jackson v. Railway, 31 Iowa, 178; Hoye v. Railway, 46 Minn., 269; Railway v. Corn, 71 Ill., 496; M. R. Sash and D. Co. v. Railway, 91 Wis., 463.

In Turnpike Company v. Railway Company, cited above, the plaintiff asked the trial court to charge the jury as follows: "If the defendants neglected to supply the engine, which is alleged to have fired plaintiffs' bridge, with the best and most perfect form of spark-catcher in use, for the purpose of guarding against the emission of sparks, and if, in consequence of such neglect, sparks were emitted which fired the plaintiffs' bridge, that without some proof of concurring neglect on the part of plaintiffs in originating the fire, they are entitled to recover." The court refused the requested instruction and gave to the jury the following charge: "The degree of care to be observed by the defendants is ordinary care, and the absence of this care, if it appear by sufficient proof, is evidence of negligence. I therefore say that if the defendants used ordinary care and skill in procuring good and safe spark-arresters, such as are most in use in the country, and approved by experienced railroad operators and mechanics, they would not be required to use any other or greater care or skill in respect to the character of the spark-arrester used by them." The Supreme Court of Pennsylvania approved the charge given. That case presents sharply the very question that we have before us,—the necessity of a charge upon the issue as to whether the railroad company exercised ordinary care in selecting its machinery, and if it did, should it be held liable for a failure in that particular? The opinion of the Supreme Court of Pennsylvania sustains the charge given by very

cogent and convincing reasons, from which we copy as follows: "What is care in one case may be negligence in another where the danger is greater and more care is required. The degree of care having no legal standard, but being measured by the facts that arise, it is reasonable such care must be required which it is shown is ordinarily sufficient under similar circumstances to avoid the danger and secure the safety needed. Ordinary care is therefore the only rule which can be stated by a court. But as the degree of care is measured in every case by its circumstances, that which is ordinary care in a case of extraordinary danger would be extraordinary care in a case of ordinary danger, and that which would be ordinary care in a case of ordinary danger would be less than ordinary care in a case of great danger.    *    *    *    Care according to the circumstances being the rule, we must not overlook what the judge said upon the particular subject to which this care related. In his answer to the first point, he said, if the defendant used ordinary skill in procuring a good and safe spark-catcher, such as are most in use in the country and approved by experienced railroad operators and mechanics, they would not be required to use any other or greater skill or care in respect to the spark-catcher used by them—now clearly this was an application of the rule to the very case before the jury, and not to one of less danger in which the care required would be less." The other cases cited sustain our conclusion as expressed in the answer to the question.

In passing upon this question, courts have usually expressed the rule without the qualification, because the facts in the case did not demand it. The standard established is that the railroad company must select the best devices in use for the purpose of arresting sparks and preventing the escape of fire from the locomotive, and it is said that a man of ordinary prudence will do so. Jackson v. Railway, 31 Iowa, 178. But this does not prescribe the form of the charge to be given, which must conform to the facts of each case. The requisites of a charge by trial courts are prescribed by article 1317, Revised Statutes, which is as follows: "The charge shall be in writing and signed by the judge, and he shall read it to the jury in the precise words in which it is written; he shall not charge or comment on the weight of evidence; he shall so frame the charge as to distinctly separate the questions of law from the questions of fact; he shall decide on and instruct the jury as to the law arising on the facts, and shall submit all controverted questions of fact solely to the decision of the jury." The requirement that the court "shall instruct the jury as to the law arising on the facts" means that it shall inform the jury as to what the law is upon the facts as proved by the testimony introduced by both parties. The facts upon which the plaintiff claims a right to recover and those under which the defendant resists that claim equally constitute the case upon which the court must submit the charge. Scott v. Railway, 93 Texas, 625.

The charges submitted by the appellant's counsel were properly refused, because they were argumentative in form and ignored the requirement of ordinary care in selecting the machinery, that it be in good

condition at the time and carefully operated.    Scott v. Railway, 93 Texas, 625.

The seventh and eighth questions are as follows:

"7.   Was the testimony admissible as against the objection urged as shown by the bill of exceptions?

"8.   Should the court have given the requested charge excluding it?"

It is insisted that because the engine which set out the fire was identified as No. 35, the testimony of Clegg was not admissible.   It must be borne in mind that when the plaintiff was developing the case, the identity of the engine which set the fire had not been established, and that the plaintiff had the right to show that any locomotive which then belonged to the appellant was defective in the particulars to which Clegg's testimony was directed.   This testimony was admissible upon the issue of ordinary care in the selection of its machinery; it would be permissible to show that all of the locomotives which were owned and operated by the railroad company were in bad condition, which would tend to prove that ordinary care had not been exercised, for it could not be expected that the exercise of ordinary care would fail in every instance to secure reasonably safe equipments.