SULLIVAN–SANFORD LUMBER CO. v.
WATSON et al.†

(Court of Civil Appeals of Texas. Feb. 2, 1911. On Rehearing, March 16, 1911.)

1. CARRIERS (§ 280*)—PRIVATE CARRIERS—INJURIES TO PASSENGERS—CARE REQUIRED.

Where plaintiff's decedent was riding on a car in defendant's logging train, the defendant at least owed him ordinary care to transport him safely, unless it was released by the contract of passage.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1085–1092, 1098–1109, 1117; Dec. Dig. § 280.*]

2. CARRIERS (§ 307*)—INJURIES TO PASSENGERS—PASSES—AGREEMENT TO ASSUME RISK.

In an action against a railroad company for injuries in a collision causing death, where deceased was riding on a pass, in which there was a stipulation that he waived all claims for damages in case of injuries from any cause, such agreement was against public policy, and defendant, though a private carrier, was liable for injuries caused by its negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259; Dec. Dig. § 307.*]

3. COURTS (§ 97*)—CONFLICT—STATE AND FEDERAL COURTS.

Where there is a conflict between decisions of the Supreme Court of the United States and those of the Supreme Court of a state upon a question of domestic policy, the latter should furnish the rule for guidance of the courts of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 329–334; Dec. Dig. § 97.*]

4. CARRIERS (§ 307*)—DUTY TO PASSENGERS—CONTRACTS.

While the right of contract is sacred, it is not absolute, but must be exercised in subordination to laws which have for their object the preservation of rights still more sacred, and the law has imposed upon a carrier, though not a common carrier, the duty to exercise a high degree of care for the safety of their passengers, and from the performance of this duty no contract can relieve the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259; Dec. Dig. § 307.*]

5. NEGLIGENCE (§ 4*)—"ORDINARY CARE."

"Ordinary care" is that measure of prudence universally exacted in all the lawful relations of life, except where, from other considerations, a higher degree of caution is enjoined.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 6; Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 6, pp. 5029–5042; vol. 8, pp. 7739, 7740.]

Appeal from District Court, Morris County; P. A. Turner, Judge.

Action by Mrs. Beulah Watson and others against the Sullivan-Sanford Lumber Company. From a judgment for plaintiffs, defendant appeals. Affirmed.

Chas. S. Todd, for appellant. J. M. Terrell and Hart, Mahaffey & Thomas, for appellees.

HODGES, J. At the time of the institution of this suit, and prior thereto, the appellant, Sullivan-Sanford Lumber Company, was a private corporation engaged in the business of manufacturing and selling lumber at Naples in Morris county, Tex. In addition to its mill and machinery, appellant also owned timber situated on lands some distance in the country, from which it obtained its supply of logs and material for carrying on its business. For the purpose of transporting logs from the forest to its mill at Naples, it had constructed a railroad extending from

the latter place about 16 miles in length to its timber lands. This railroad was in all material respects similar to the usual standard gauge railroads constructed and used by the common carriers of the country. In operating this railroad two ordinary railway locomotives, and cars adapted to the business carried on, were used. No passengers were carried except the employés of appellant and those engaged in cutting timber, or some one seeking employment from the timber contractor. Nor was any freight carried except that belonging to the appellant, or to its timber contractor. It was customary for what is called the "log train" to make daily trips, going out in the morning and returning in the evening; and on this train those who were entitled to passage were transported. Persons other than employés who desired passage were given a permit, or pass, for which no charge was made. Such permits contained the following stipulation: "The user of this pass rides only on the following conditions: (1) This permit is accepted with the understanding that the person using it assumes all risk of injury of any character while using the same and hereby waives any claim for damages in case of injury. (2) The Sullivan-Sanford Lumber Company's railroad is not a common carrier and does not transport passengers for hire, but only carries its own officers and employés to and from their work for their own convenience and without charge. [Signature] ——————." In July, 1909, J. A. Watson, who was not an employé, but was returning from a search for employment, was killed in a collision while riding on appellant's log train; and this suit was instituted by his surviving wife and children to recover damages resulting from his death.

The facts show that on the morning of the day of his death Watson went to appellant's mill at Naples, seeking employment. He found none, but was referred to J. H. Findley, an independent contractor, who had established a logging camp upon appellant's lands and was engaged in cutting and supplying the mill with logs. Desiring to apply to Findley for work, Watson obtained from Lockridge, appellant's general manager, a permit, or pass, to go out that morning on the log train to Findley's camp. Upon reaching that place he was again unsuccessful in finding employment, and decided to return on the same train that evening. He was furnished by Findley, who, it seems, was authorized to do so, with another permit, or pass, entitling him to ride on that train to Naples. Both the pass issued by Findley and that given by Lockridge in the morning contained the usual stipulations heretofore referred to as embraced in permits to ride over that road. Besides Watson, the train upon that occasion carried as passengers Findley and some of his employés. It left the camp some later than usual, and was still further delayed en route by conditions

not necessary to here notice. Although due at Naples at 6 o'clock p. m., it had not arrived three hours later. About 9 o'clock that night appellant's general manager, J. W. Lockridge, Martin Sullivan, its acting secretary and treasurer, and some of the employés, boarded a locomotive used about the mill for switching purposes, and started out in search of the delayed train. The night was dark, and the railroad contained a number of curves. The engine pulling the train upon which Watson was riding was being run without any headlight, on account of the defective condition of the lamp provided for that purpose. The locomotive upon which Lockridge and his party were riding was moving backwards and upon the same track on which the train coming from the camp was running. The only light provided on it was a lantern held by one of the men sitting on the rear end of the tender. The locomotive proceeded at a rather slow rate of speed, whistled for a crossing just as it was passing out of the yards, but gave no other signals thereafter. When this party had reached a point estimated at from one-fourth to one-half of a mile from the mill, the locomotive collided with the belated train. The engineer on that train was not expecting to meet any such obstruction, and was traveling at the rate of about 15 or 20 miles per hour. The collision was so violent that it practically demolished one of them, derailed several of the cars, killed Watson and one of the employés, and injured others. The proximity of the two locomotives was not discovered by those operating them till so near together that a collision was unavoidable. There was evidence tending to show that the log train was not equipped with brakes sufficient to enable those in charge to make a quick stop; that the engineer had never been over the road before that day, and knew nothing about the condition of the track.

Martin Sullivan was made a party defendant in the suit. The petition, among other things, charged negligence in the following particulars: In placing in charge of the log train an inexperienced engineer, failing to provide a headlight and brakes for that train, and in running on the same track the locomotive with which the train collided.

The defendants answered separately, the appellant, Sullivan-Sanford Lumber Company pleading, after demurrer and exceptions and general denial: (1) Contributory negligence and unanticipated inevitable accident; (2) that as a private corporation it was not liable under the statute for the negligence of its servants and agents for injuries resulting in death; and (3) that the deceased, Watson, by contract, verbal and in writing, expressly assumed all risk of injury or death, and expressly waived any and all claim for damages. On a trial before a jury, a verdict was rendered in favor of the defendant Martin Sullivan, and against the

Sullivan-Sanford Lumber Company for $8,-750.

The principal ground relied on for a reversal of this case is the refusal of the court to recognize as a valid defense the stipulation in the pass on which Watson was riding at the time he was killed, by which he assumed all risk of injury and waived any claim for damages. It is contended that the appellant was not a common carrier, and therefore had the right to contract with Watson for exemption from liability for injury resulting from its negligence and that of its servants. It is claimed that the legal effect of the conditions embraced in the pass issued to Watson, and agreed to by him, was to entirely relieve the appellant from any liability for such injuries, and hence the court erred, not only in submitting the issue of negligence as a basis of recovery, but in refusing to give a peremptory instruction in favor of the defendants in the suit. This feature of the appellant's defense was met with the proposition that the stipulation contained in the pass, in so far as it might be construed as exempting the appellant from liability on account of its negligence or that of its employés, was void on the ground that it was opposed to the public policy of this state. The trial court adopted that view of the law and formulated his charge to the jury accordingly. Counsel for appellant does not in his brief contend that the testimony was not sufficient to establish negligence as the direct cause of Watson's death.

For the purpose of this discussion it may be conceded that under the evidence the appellant was not a common carrier, and that the question of its liability should not be determined by the rules of law applicable exclusively to that class of transporting agencies. It was, however, upon this particular occasion performing the services of a private carrier, and as such had undertaken to transport Watson as a passenger to his destination. Unless it had been released therefrom by the terms of the contract pleaded, it owed Watson the duty of exercising at least ordinary care for his safety while he was a passenger upon its train.

"The public policy of the government is to be found in its statutes; and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials. But, when the lawmaking power speaks upon a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts." United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. See, also, People v. Shedd, 241 Ill. 155, 89 N. E. 332.

It is one of the primary duties of the state to provide for the personal security of the lives of its citizens. In the performance of that duty the Legislature of this state has enacted various statutes defining culpable homicide and providing appropriate penalties for their violation. Among other provisions relative to this subject, our Penal Code contains the following:

"Art. 651. Homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another."

"Art. 681. Homicide is excusable when the death of a human being happens by accident or misfortune, though caused by the act of another who is in the prosecution of a lawful object by a lawful means."

"Art. 684. If any person in the performance of a lawful act shall by negligence and carelessness cause the death of another, he is guilty of negligent homicide of the first degree."

"Art. 686. To constitute this offense there must be an apparent danger of causing the death of the person killed, or some other.

"Art. 687. The want of proper care and caution distinguishes this offense from excusable homicide. The degree of care and caution is such as a man of ordinary prudence would use under like circumstances."

"Art. 689. To bring the offense within the definition of homicide by negligence either of the first or second degree, there must be no apparent intention to kill.

"Art. 690. The homicide must be the consequence of the act done or attempted to be done.

"Art. 691. Negligent homicide of the first degree shall be punished by confinement to the county jail not exceeding one year, or by fine not exceeding one thousand dollars."

We have in the foregoing a positive declaration of the lawmaking power as to the policy of this state with reference to protecting life against the negligent conduct of others. A homicide caused by negligence, while not punished with the same severity, is as much a violation of the statutes of this state as those which result from culpable motives. It is not contended, nor do we think it could be done with any show of reason, that the death of Watson was not one of the natural consequences which might have been expected to follow from the conduct relied on to show negligence in this case. Traveling on railroad trains running at the usual rates of speed is always attended with more or less of danger to life and limb. When two trains move in opposite directions upon the same track under the conditions disclosed by the evidence in this case, a collision and death to those on board might well be considered among the consequences likely to follow.

We come now to the pivotal question: Could Watson in advance by contract release the appellant from its civil liability for an injury resulting in his death caused by its negligence or by that of its servants? As supporting that right, counsel for appellant refer to decisions of the Supreme Court of the United States and of many other

states in which similar stipulations for exemption from liability for the negligence of the carrier are held valid. The leading cases relied on are: B. & O. S. W. Ry. Co. v. Voigt, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, and N. P. Ry. Co. v. Adams, 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513. In the first case referred to, Voigt, the injured party, was an express messenger riding in a car set apart for the use of an express company, and was injured by the negligence of the railway company by which the car was being transported. There was an agreement between the two companies that the express company would hold the railway company free from all liability for negligence, whether caused by the negligence of the railway company or its employés. Voigt, when entering into the employ of the express company, signed a contract in writing whereby he agreed to assume all risk of accident or injury in the course of his employment, whether occasioned by negligence or otherwise, and expressly ratified the agreement between the express company and the railway company. It was held that he could not maintain an action against the railway company for injuries resulting from the negligence of its employés. In rendering the opinion, Mr. Justice Shiras said:. "Without enumerating and appraising all the cases respectively cited, our conclusion is that Voigt, occupying an express car as a messenger in charge of express matter in pursuance of the contract between the companies, was not a passenger within the meaning of the case of New York C. R. Ry. Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627]; that he was not constrained to enter into the contract whereby the railroad company was exonerated from liability to him, but entered into the same freely and voluntarily, and obtained the benefit of it by securing his appointment as such messenger; and that such a contract did not contravene public policy." That decision has since been followed and approved by the same court and by several courts of last resort in different states in the Union.

The Adams Case was one in which a passenger was injured while traveling on a free pass and sought to recover damages for injuries resulting from the negligence of the carrier. The defense was that the carrier was released by a contract stipulating that it should not be liable for its negligence or that of its servants. After referring to the Voigt Case and quoting a portion of the opinion, the court said: "In the light of this decision but one answer can be made to the question. The railway · company was not, as to Adams, a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing. If he had desired to hold it to its common-law obligations to him as a passenger, he could have paid his fare and compelled the company to receive and carry him. He freely and voluntarily chose to accept the privilege offered, and, having accepted that privilege, cannot repudiate the conditions. It was not a benevolent association, but doing a railroad business for profit; and free passengers are not so many as to induce negligence on its part. So far as the element of contract controls, it was a contract which neither party was bound to enter into, and yet one which each was at liberty to make, and no public policy was violated thereby." The appeal in that case was from a judgment rendered in the United States Circuit Court for the District of Washington. The opposite rule has been adopted by the courts in Mississippi, Alabama, Iowa, Minnesota, Missouri, Arkansas, and Pennsylvania. See notes to Y. & M. V. Ry. Co. v. Grant, 4 Am. & Eng. Ann. Cas. 556, where the authorities on both sides of the question are collated and discussed.

As also opposing the doctrine announced in the two federal cases, we are referred to the case of Railway Co. v. McGown, 65 Tex. 643. McGown was also a passenger using a free pass which contained a stipulation releasing the railway company from liability for injuries resulting from its negligence or that of its servants. He was injured by the derailment of the train and sued for damages. Among other defenses, the railway company pleaded the contract of exemption. This defense was attacked on the ground that it was void because opposed to public policy. In a well-considered opinion by Chief Justice Stayton this contention was sustained. In discussing that question he said: "The relation of passenger and carrier is created by contract, express or implied, but it does not follow from this that the extent of liability or responsibility of the carrier is, in any respect, dependent on a contract. In reference to matters indifferent to the public, parties may contract as they please; but not so in reference to matters in which the public has an interest. For the purpose of regulating such matters, rules have been established, by statute or the common law, whereby certain duties have been attached to given relations and employments. These duties attach as matter of law, and without regard to the will or wish of the party engaged in the employment, or of the person who transacts business with him, in the course thereof; and this is so for the public good. Duties thus imposed are not the subject of contract. They exist without it, and cannot be dispensed with by it. The violation of such a duty is a tort. The law declares that it is the duty of a public carrier of passengers to use the highest degree of care to insure their safety. Why was not this left to be settled by the contract of the carrier and passenger?

Certainly for no other reason than that the employment itself was of such a nature as to make it a matter of public concern. None could be of greater public concern, at the present 'day, 'than these employments by which men, women, and children are transported by millions, by agencies of a most dangerous character, and with a speed heretofore' unknown. As said in Railway Co. v. Derby [14 How. 468, 14 L. Ed. 502]: 'This duty does not result alone from the consideration paid. It is imposed by the law, even where the service is gratuitous. The confidence induced by the undertaking of any service for another is a sufficient legal consideration to create a duty in the performance of it.' Railroad Co. v. Wier, 37 Mich. 115 [26 Am. Rep. 499]." In a decision of comparatively recent date the Supreme Court of Virginia has announced a similar holding. N. & W. Ry. Co. v. Tanner, 100 Va. 393, 41 S. E. 721.

In case of conflict between the decisions of the Supreme Court of the United States and that of our own state upon a question of domestic policy, we think the latter should furnish the rule for our guidance. Each state by virtue of· its local sovereignty has the right to adopt its own policy for the regulation of its internal affairs, so long as in doing so it does not invade rights protected by the Constitution of the United States. Subject to that limitation, it has the power, when deemed essential to the protection of the public welfare, to determine that certain classes of contracts shall not be entered into, or, if made, shall be unenforceable.

While the rule announced in the McGown Case has not, so far as we have been able to ascertain, been applied in determining the validity of similar contracts entered into with private carriers, or private parties other than employers, yet we feel that the principle upon which it is based, together with the statutory provisions before referred to, justify the conclusion that the public policy of this state forbids the making of a contract whereby one may escape the civil consequences of his negligence. Watson and his dependent ones were not the only parties interested in the preservation of his life; but the state, as the representative of the public at large, was also concerned' in safeguarding him against dangers likely to result in his death. When the sovereign in providing for the public security of its citizens declares that a certain grade of negligent conduct shall be unlawful, no other has the power to make it lawful. When the law imposes a duty for the public good, no private contract can remove the obligation.

The right of contract is sacred; but it is not absolute. It must be exercised in subordination to laws which have for their object the preservation of rights still more sacred. The law has imposed upon common carriers the duty of exercising a high degree of care for the safety of their passengers. From the performance of this duty no contract can relieve the carrier. It is likewise made the duty of every person to exercise ordinary care to avoid destroying the life of another. Upon what ground can it be said that this latter duty may be contracted away? In each case the obligation is imposed for the public security and in pursuance of a sound public policy. We are unable to perceive the logic of the rule that would make one the subject-matter of contract and exclude the other.

It is contended that Watson was admitted as a passenger solely for his own accommodation, and was paying nothing for the service he was receiving. In both the McGown and Tanner Cases before referred to the transportation was being gratuitously performed; but the courts held that that fact did not alter the rule. It would indeed be a barbarous law that would permit a carrier whose negligence had caused the death of a passenger to defend its wrong by proving that the transportation was to be without charge. Such a defense might be good against a complaint that the transportation had not been completed, but not against the charge that the passenger had by the negligence of the carrier been placed in a worse condition than before his transportation was undertaken. While the failure to exercise ordinary care to prevent injury to another may in some instances be properly regarded as a breach of a contractual duty, it does not rest upon contract alone, but finds its ultimate basis in an imperative requirement of the law, dictated by a sound public policy. "Ordinary care" is that measure of prudence universally exacted in all the lawful relations of life, except where, from other considerations, a higher degree of caution is enjoined. One person owes it to another when mingling in social contact; when pursuing the usual avocations, whether engaged in separate, or common, employment; when meeting as strangers on the highway, or coming together in the tumult of public assemblies. It clings to the individual in every walk of life, enters every grade of service, and is written in every obligation assumed. The duty exists where contracts cannot bind; it rests upon the infant as well as the adult, and in many cases upon the insane as well as the sane. One who takes passage upon a railway train necessarily places himself largely at the mercy of the carrier and its servants, and must depend for his safety upon their prudence and caution. That situation strengthens the cogency of the reasons upon which the requirement to exercise at least ordinary care is founded.

It may be said that, if Watson had been fatally injured, but had survived long enough, he might have made a contract releasing the appellant from its liability for the damages caused, and that such a contract would have been binding on his wife

and children after his death. This being correct, it may then be asked: Why could he not in advance make a contract equally as binding? If one does not contravene public policy, why should the other? Without reference to the consideration which may operate as the inducing cause for entering into such contracts either before or after injury, the distinction lies in the difference between their legal and practical effects. A contract of release executed after injury simply extinguishes an existing liability. One executed in advance grants an immunity, and thereby confers a license to inflict the injury, and in this way tempts the perpetration of a ·legal wrong. The imposition of civil liability as the consequence of negligent conduct resulting in death, or serious bodily injury, may justly be regarded as only a part of the method adopted by governments for discouraging that species of wrongdoing. Compensation is generally considered the purpose of the law, largely, perhaps, because it measures the extent of the liability. If compensation is the only object, why not permit a recovery in all cases where such injuries occur? The damage is just as great whether the injury be innocently or willfully inflicted. If the remedy is not in part, at least, to discourage a wrong, why limit it to cases where the wrong is the cause?

According to our interpretation of the public policy of this state, it is opposed to the character of contract interposed as a defense in this case. Watson could not agree that another might take his life in a way which the law has condemned as culpable and punishable.

The proposition discussed being the only question presented for review, and finding no error, the judgment should be affirmed.

### On Rehearing.

Appellant calls attention to the case of M., K. & T. Ry. Co. v. Carter, 95 Tex. 461, 68 S. W. 159. This case was cited in the brief of counsel for appellant, but was not referred to nor discussed by us in the original opinion, because we did not think it should be considered as relevant authority upon the proposition here involved. The facts of that case show that Carter & Bro. were the owners of a sawmill and planing plant situated on a lot adjoining a spur track of the railway company. Their plant, together with a stock of lumber, were burned under circumstances from which it might have been inferred that the fire was due to sparks escaping from a locomotive belonging to the railway company. Carter sued for damages, alleging negligence on the part of the railway company in failing to properly equip its locomotive with a sufficient spark arrester, and on the part of the servants of the railway company in its operation ·upon that occasion. Among other defenses, the railway company relied upon a contract by which they were released from any liability

for damages resulting from such conduct. The contract recited an agreement by which the railway company was to build the spur track a distance of about 70 feet from the main line at the point where Carter's plant was situated, and that it was done for the latter's convenience in shipping lumber and other freight. It is then provided that, in consideration of the premises and of the construction of that side track and switch, the owner of the mill released the railway company from all damages and claims arising from the injuring or killing of stock belonging to him, or his contractors, or employés, or that might be injured or killed by locomotives or trains or cars of the railway company on the line of the road or on its tracks, and for all damages resulting from the injury or destruction of any property whatever that might be injured or destroyed by fire or sparks from any locomotive of the railway company at or about that switch. In reply Carter sought to evade the force of that contract by attacking its validity on the ground that it was opposed to public policy, in that it was a contract exempting a common carrier from the consequences of its negligence. While the case was pending in the Court of Civil Appeals, that question and others were certified to the Supreme Court. Justice Brown, in an opinion sustaining the validity of the contract, says: "A railroad company, when not contracting in its character of common carrier, has the same right of contract as other corporations or persons, and in many instances may make contracts for immunity from liability on account of the negligence of itself and servants." After referring to a number of authorities, among which are included what are commonly called the "Express Company Cases," decided by the Supreme Court of the United States, he continues: "We can see no reason why the contract in this case should be forbidden that does not apply with equal force to the cases cited. There being no general rule of public policy which will condemn this contract, the inquiry then arises: Is there in the state of Texas any such policy indicated, either by statutory provision, its Constitution, or judicial decisions, as would establish a right in the public inconsistent with the terms of this contract?" After discussing the principles underlying the proposition, he then says: "We conclude that the contract certified is not violative of the public policy of the state, but is a legitimate exercise of the liberty of contract, by which the appellees voluntarily, and for the purpose of securing the convenience of the railroad at that point, agreed to release the railroad company from liability for injury which might occur to their property by the negligence of the employés of the railroad, or by such unavoidable accident as is frequent by the escape of fire from the best equipped machinery."

The effect of that decision is to say that

one not a common carrier, and even a common carrier itself when not contracting as such, may by contract secure immunity from liability for damages resulting from its negligence or that of its servants. The distinction between that case and the one before us lies in the difference between property and human life. When considered as an object of governmental protection, these are not to be put in the same class. The protection vouchsafed to one in the enjoyment of his property is that he shall not be deprived of it without his consent, except in some manner pointed out in law. It is given for the personal benefit of the property owner. All conduct resulting in injury to one's property or property rights is deemed wrongful only when in opposition to the consent of the owner. The owner alone, in the eyes of the law, has the right to complain of such injury. But not so with respect to the lives of individuals. In the preservation of these the public at large has an interest. Conduct which results in the destruction of life is not relieved of its culpability by the consent of the victim previously obtained, or by his condonation thereafter given. If the guaranty of public security sought to be made effective by prohibitory legislation is one of the essential and primary duties of government, the observation of the regulations and restrictions imposed for that purpose become the duty of every citizen within the state. If it is made a personal offense to negligently kill another, then it follows that the duty to observe ordinary care not to kill is one imposed by law for the benefit of society. If this be true, can it then be said that this duty may be contracted away? Every tragic death is a shock to society as well as an injury to the individual. A contract, which provides that for a valuable consideration one may relax that degree of prudence and vigilance toward another which the law enjoins as a guaranty of personal security, necessarily contemplates the doing of something which the law for a wise purpose has forbidden. It is true that the penalty denounced by law for negligent homicide can be visited only upon the person guilty of the wrongful conduct; but civil courts broaden the range of responsibility and extend it to those whom the wrongdoer represents. In this case the principal is a corporation which can act only through its agents; but we do not think it could for that reason make this particular kind of a contract. We know of no reason why a contract, held to be void because opposed to public policy when made by a private person, should not be equally as offensive when entered into for the benefit of a private corporation. It is contended that, if the appellant could not contract for exemption from its own negligence, it could by that means secure immunity from liability for damages resulting from the negligence.

of its servants. We are not referred to any adjudicated case in which such a distinction has been made. The evidence shows that the collision which was the immediate cause of Watson's death was the result of conduct initiated by and carried on under the immediate direction of Lockridge, appellant's general manager. The case does not furnish an instance of an injury caused by the negligent conduct of some subordinate employé, but of the corporate representative himself, who, upon that occasion, stood in its stead. The act of Lockridge was the act of the company itself.

It may be that the conclusions we have reached in this case are not in harmony with those announced by very eminent authority; it is also possible that our views may not meet the approbation of the court of last resort in this state; but, be that as it may, we think the principles upon which we have rested our decision should be recognized as sound in law. So thoroughly are we impressed with the justness of that conclusion that we have determined that, if contracts of this character are to be held valid and binding obligations in this jurisdiction, they must receive their sanction at the hands of some other tribunal to whose mandates we are required to yield obedience.

The motion is overruled.