WALLING v. HOUSTON & T. C. R. CO.
(No. 7707.)

(Court of Civil Appeals of Texas. Dallas. April 21, 1917. Rehearing Denied May 26, 1917.)

1. NEGLIGENCE 1—DEFINITION.
"Negligence" includes both acts of commission and omission. It is the doing of that which a reasonably prudent person would not do under the circumstances of the situation, or the failure to do that which a reasonably prudent person would have done under the circumstances.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 1.

For other definitions, see Words and Phrases, First and Second Series, Negligence.]

2. LANDLORD AND TENANT 37—UNAMBIGUOUS CONTRACT—CONSTRUCTION BY COURT.
A contract being unambiguous, it was the court's duty to construe it.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 98.]

3. RAILROADS 469—LIABILITY FOR FIRE—LEASE CONTRACT.
Where plaintiff built a grain and seed storage house on a railroad's right of way, under a lease contract with the road which declared that the lessee agreed that the lessor was released from all liability whatsoever on account of any loss or damage by fire to the property of the lessee, whether occasioned by sparks from locomotives or otherwise, or from any other cause whatsoever growing out of the making of the lease, the road was not liable for destruction of the seed house by fire set when a car of cotton seed hulls had been received and then rejected by the lessee because its contents were discovered to be on fire, after which the burning hulls were thrown on the ground, and the contents of the car and house inspected and left for the night.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1665.]

4. RAILROADS 469 — LIMITING LIABILITY FOR FIRE.
The statute declaring that a common carrier shall not limit its common liability by contract had no application to a railroad's leasing a site on its right of way for a grain and seed house and contracting against liability for loss to the lessee occasioned by fire, since the contract did not embrace property for which the road could be held liable as a common carrier.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1665.]

5. LANDLORD AND TENANT 125(1)—CAVEAT EMPTOR.
The tenant, in the absence of agreement to the contrary, takes the rented premises as he finds them, under the doctrine of caveat emptor.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 441.]

6. RAILROADS 483—LEASE OF RIGHT OF WAY—CONTRACT—DAMAGES.
Where a railroad leased a site on its right of way for a grain and seed house, and the lessee could not procure insurance on the house

he erected because in near proximity there was another building used by another tenant of the road's for the storing of inflammable oils, and thereafter the seed house was burned, damages suffered by its owner through his inability to procure insurance were not within the reasonable contemplation of himself and the road at the time of execution of the lease contract, or such as would naturally and probably result from a breach of such contract, and so were too remote to be recovered of the road.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1737–1739.]

7. RAILROADS 481(1) — DESTRUCTION OF GOODS BY FIRE—EVIDENCE.
Where a railroad's tenant did not sue to recover the value of cotton seed hulls burned in a car shipped to him, but for the value of his grain and seed house, situated on the road's right of way, and the hulls therein destroyed by fire communicated from the hulls in the car, testimony offered by the tenant, tending to show an admission on the part of the road that the car of hulls, when burned, was in transit, was properly excluded, as immaterial and irrelevant.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1717, 1718, 1726, 1728, 1729.]

Appeal from District Court, Limestone County; N. B. Daviss, Judge.

Suit by J. P. Walling against the Houston & Texas Central Railroad Company. From a judgment for defendant, plaintiff appeals. Affirmed.

L. B. Cobb and Richard Mays, both of Corsicana, for appellant. Baker, Botts, Parker & Garwood, of Houston, Stribling & Stribling, of Waco, and C. S. Bradley, of Groesbeck, for appellee.

TALBOT, J. This suit was instituted by the appellant to recover of the appellee the value of his house, located under lease contract on appellee's right of way, and the value of certain personal property destroyed by fire, or in the alternative the amount of the insurance he might have had thereon, but for the alleged fault of the appellant. The allegations, in substance, are:

"That appellant, desiring to engage in the business of dealing in grains and cotton seed and products thereof, applied to the appellee's agent to lease a portion of its right of way at Thornton for building thereon a house for the reception, storage, and, discharge of such articles, and upon the 1st day of September, 1900, entered into a contract with the appellee whereby it let and demised to him for the term of three years, beginning the 1st day of September, 1900, a designated parcel of its right of way at Thornton for the purposes above stated at the rental of $1 per month, payable annually in advance for 12 months. That upon the expiration of this contract it was renewed and extended, orally and in writing, being in all parts, excepting the dates and times, like the first contract made, until the 31st day of August, 1912. That after September 1, 1912, without a written contract, appellant continued to occupy said premises, paying the same rental therefor for one year beginning on September 1, 1912, and continued to conduct his said business in said house erected on said premises by him shortly after September 1, 1900, until said house was burned. That said house was destroyed by fire on or about November 7, 1912, in the following manner: That appellant had received on that day over

appellee's road a car of cotton seed hulls, which was about 10 o'clock of that day placed by appellee for unloading on a spur track about 10 feet from his house. That shortly thereafter he began unloading the hulls into his house, and after removing a part of the same found they were damaged by heat, fire, and smoke, and he determined to reject them, as he feared they might burn his house, of which condition he apprised appellee's agent at Thornton, and of his rejection of the hulls, and requested of the agent that said car be removed from the vicinity of his house. That the agent, instead of removing the car, threw out of the car, and near appellant's house, about a ton of the said hulls, and let them and the car remain near his house all day, and until the hulls of their own heat ignited and burned. In this connection the appellant pleads the following provisions of the written lease under which he claims he was holding over said premises at the time of their destruction by fire: 'Said lessee further expressly agrees that said lessor is hereby released from all liability whatever on account of any loss or damage by fire to the property of said lessee, whether occasioned by sparks from locomotives or otherwise, or from any other cause whatsoever growing out of the making of this lease. It is further agreed that in event any property of the said lessee should be destroyed or damaged from any cause growing out of the making of this lease, and the said lessor should be liable therefor and pay for same if said property should be insured by the lessee, then and in that event the said lessor is to be subrogated to any and all insurance that the said lessee may have on said property so destroyed to the extent that said lessor may have paid for the same.' That from the time he began to do business in said house until a few months before said fire he had and maintained insurance against fire upon said house and contents in solvent insurance companies, and that a few months before said fire appellee knowingly caused the cancellation of valid policies he then held on said house and contents in the amount of $1,800, and prevented him from procuring other insurance thereon by permitting and aiding in the storing and keeping of petroleum oils and delivering same over its railroad in and into a wooden house on its right of way about 6 feet of appellant's said house, which wooden house had been put under a lease contract with appellee by other parties for the storing of cotton seed only, and appellee could have prevented the storing of oils therein. That by reason of the storing of petroleum oils in the house near appellant's he was prevented from obtaining insurance, of which fact the appellee had notice. That the permitting of the storing of petroleum oils in said house constituted a breach of the appellee's contract of lease with appellant. Appellant further alleges that, if the appellee is not liable for all the loss' caused by said fire, it is at least liable for the amount he would have collected on his policies on said house and contents, but for the wrongful conduct of appellee in causing the cancellation of his insurance policies, which amount is alleged at $1,-800; the value of the house and contents being alleged at $3,280.05."

Appellee answered by general and special exceptions, a general denial, and by special pleas, in which it first pleaded the above provision of said lease pleaded by appellant, and alleged in connection therewith that the destruction of said house and contents by fire, if in fact the same was occasioned by any act on the part of the appellee, which is not admitted, but denied, same was covered by said lease contract, and that appellee is not liable therefor; that at the time of said fire said contract was in full force, and that ap-

pellant was in possession and holding said leased premises under said contract, holding said premises over under said lease after the expiration of the three years stipulated therein; that the car of hulls was consigned to appellant at Thornton, having been shipped over appellee's line of railway, and said car was delivered to appellant on a side track at his warehouse; that he paid the freight thereon and accepted the carload of hulls, and defendant had no further control, interest, or property rights in the same; that the hulls became ignited in some manner to the appellee unknown, while in said car, and thereafter, while appellant's servants were unloading the same into his house, and during the night of November 7th, they became ignited and destroyed the house and its contents, as well as appellee's car; that the loss of the house and contents was the result of the negligence of the appellant and his servants in placing in said house hulls that had become heated in the car to such an extent as to thereafter ignite and destroy his house. Appellee further alleged that the appellant knew that the cotton seed hulls in the car were on fire at the time his servants were unloading the same into his said house, and knew that about one ton of the hulls had been thrown out of the car near his house and were burning, and that the danger of his seed house being set on fire from the burning hulls was as open to the appellant as it was to the appellee; that with the knowledge of such danger appellant failed to guard his house and take necessary precaution against the same being set on fire from the burning hulls, and that the loss of his house and contents was the proximate result of his own negligence.

For further answer, appellee alleged that petroleum oils had been continuously stored in the building near appellant's house since about the 1st of September, 1911, up to October 31, 1912, of which appellant had full knowledge, and with such knowledge appellant voluntarily continued to hold over under his lease contract on and after September 1, 1912, and that by reason thereof appellant took said premises subject to the then known conditions, and voluntarily assumed the risk of damage resulting to him by fire, by being unable to secure insurance upon his said buildings and contents. Appellee further alleged that at the time of the destruction of appellant's house by fire the house wherein petroleum oils had been stored by other persons was no longer occupied by them, and no oils had been stored therein since the 31st day of October, 1912, and that from that date up to the 7th day of November, 1912, appellant's ability to secure insurance was not affected by the conditions as to the storing of oils in said adjoining building, and that appellant's failure to have insurance on his building and contents at the time of the fire was the proximate result of his own acts and

negligence. Appellant denied the allegations of negligence in appellee's answer. .

After the appellant offered his testimony in support of the allegations in his petition, the court upon motion of the appellee instructed the jury to return a verdict for appellee, which was accordingly done, and judgment entered in accordance therewith. Motion for new trial having been overruled, this appeal was perfected.

The main propositions contended for by the appellant, and upon which he seeks a reversal of the case, in substance are: (1) That the court erred in directing a verdict for the appellee, because the evidence sustained all the material allegations in appellant's petition, and the facts alleged therein entitled him to recover, or that the evidence was at least sufficient to render the material facts issuable, and to take them to the jury. (2) That "the court erred in construing the lease contract under which appellant occupied the house upon a portion of appellee's right of way, for the destruction of which this suit was brought, so as to place upon appellant the risk of the burning of said house and contents, under the facts shown by the testimony —such fact being: Appellee had placed within 10 feet of appellant's house a freight car containing burning cotton seed hulls, and kept the same there after appellant had objected to the same, because of their condition, and had so notified the agent of appellee, who had thereupon assumed charge of the car, and neglected to remove same for the space of about 16 hours, after being requested by appellant to remove the same, and being, or ought to have been, aware of the danger to appellant's property from the condition of the said car and the hulls therein." (3) That "the court erred in holding that there was no evidence which raised the issue of appellant's right of recovery for damages growing out of his failure to procure insurance, because of the storage of inflammable oils in the Alston house, near appellant's. There was evidence raising said issue, which should have taken it to the jury, and the court should have submitted said issue to the jury; it being shown that appellant objected and protested to the use of said Alston house for storage of said inflammable oils."

To these propositions the appellee replies: (1) That "the appellee by the lease contract did not undertake to limit its common-law liability as a common carrier, and the provision of the contract releasing it from all liability for loss or damage by fire, whether occasioned by sparks from its locomotives or otherwise, as well as all damages growing out of the making of the lease, was a valid and binding contract on the parties." (2) That "the material facts in evidence being undisputed, and there being no ambiguity in the provisions of the lease contract under which appellee claimed exemption from liability, it was the province and duty of the court to construe the contract and instruct a verdict in accordance with the court's interpretation of such contract; and the provisions of the lease contract, together with the undisputed evidence, required that the court instruct a verdict for the defendant." (3) That "under the provisions of the lease contract the railroad company was released from all liability whatever to appellant, on account of loss or damage by fire to his house and contents occasioned by any act of negligence on the part of the railroad company, its servants or agents, short of wantonness or willfulness indicating a criminal wrong. (4) That the evidence does not raise, or tend to raise, the issue of a willful or wanton act on the part of the appellee's servants, indicating an intention or purpose to destroy the house of appellant, and it would have been improper for the court to have submitted this issue to the jury for their determination. (5) That the tenant, in the absence of an agreement making a different rule, takes the demised premises as he finds them, under the principle of caveat emptor. (6) That the undisputed evidence shows that the appellant made no effort to secure insurance upon his house and contents within a reasonable time before same was destroyed by fire, or to ascertain whether the same conditions existed with reference to the storing of oils in the house adjoining his as when he was first notified by the insurance agent that the insurance companies would not renew policies on his house and contents, and that the house in which the oils were stored was under the control of the appellee. (7) That the damages sought to be recovered by appellant on account of loss of insurance on his property were too remote and speculative to authorize the court to submit the issue to the jury for their determination.

We are of opinion the court correctly directed a verdict in favor of the appellee. There is very little, if any, conflict in the testimony, and it shows without contradiction the existence of the material facts asserted by the appellee in support of its propositions urged in response to the contentions of the appellant. The house of the appellant destroyed by the fire in question was built by him upon the appellee's right of way, and, together with the personal property claimed to have been burned, was in his possession, entirely under his control, and being used for the purposes agreed upon, by virtue of the lease contract alleged. This contract, after reciting that it was distinctly understood and agreed that the property leased should be used exclusively for shipping grain and cotton seed, and for no other purpose, declared that:

"Said lessee further expressly agrees that said lessor is hereby released from all liability whatever on account of any loss or damage by fire to the property of said lessee, whether occasioned by sparks from locomotives or otherwise, or from any other cause whatsoever growing out of the making of this lease."

It was also stipulated in the lease that the lessee or assigns has the right to remove the improvements placed on the premises by him at will at the expiration of the lease, if done within 30 days after it terminated. J. P. Walling, testifying in his own behalf, stated as follows:

"For the last 10 years I have been in the grain business, handling grain, hay, cotton seed, cotton seed hulls, cotton seed meal, cotton seed cake, and different kinds of grain chops, maize chops. The first transaction I had with the Houston & Texas Central Railroad Company with reference to the grain business was about the year 1900, and I entered into a written contract with them at that time. I wanted to go into this business, and I first signed an application for the place on the right of way in order to engage in the grain business."

The witness in substance further testified that the lease was prepared or written by the appellee, that he had nothing to do with the preparation or writing of it, and that he continued to transact the business specified in the lease contract on the appellee's right of way in a house built by him from 1900 to the date of the fire, November 7, 1912. He further stated that the fire that destroyed his property occurred on the night of November 7, 1912, or 4:30 o'clock of the morning of November 8, 1912; that between September 1st and the time of the fire he had paid appellee the rental for the ensuing term; that he was not at the house when the fire began, but that he was there the day before the fire. He said:

"I had bought a car of cotton seed hulls prior to that time at Hearne. The car of hulls was shipped to me from Hearne to Thornton by the Planters' Oil Company. The defendant railroad company hauled it from Hearne to Thornton. It must have arrived at Thornton on or about the 6th of November. I did not see the car when it came in. It was placed at my grain house in the afternoon of the 6th by the railroad company. We have two days to unload the car before they begin charging demurrage or storage on the car. We first began to unload or go into the car on the morning of the 7th. I had told my hand, Rast Chambers, on the evening before the morning of the 7th, that we had a car of hulls on the track, and to unload it next morning, if he could get help, and he did so. I was not there when they opened the car. I presume it was about 9:30 when they began work. They had been working but a little while when one of them called my attention to the fact that they had struck fire in the car, and I went through the rooms where they had been unloading the hulls, and noticed in the car that the hulls were afire, and I stopped them from unloading, and told them not to unload any more of the hulls. I went and notified the railroad agent that the hulls in the car were afire, and I told him in the meantime that they were ruined or damaged as far as I was concerned, and that I would not have them, and turned them back. I told him, also, that I would like to have him move them out of there; that I was uneasy about them; that they would be liable to burn me out. The agent came with me at once, and got up into the car. The agent's name is Mr. Arendale. Mr. Arendale and the negro boy, Rast Chambers, that worked for me, threw some of the hulls out on the ground on the far side of my house. I suppose they threw out somewhere about 1,800 or 2,000 pounds. I went back near the car, and noticed that the car was still there, and that the hulls on the ground were still burning. It was a slow smoldering, but were not blazing up, but were smoking. This was about 10 o'clock in the morning. The car stayed there all during the day. I went back to the depot in the afternoon to see about the car of hulls, and told Mr. Arendale that I was uneasy about it. I was afraid that it would burn me out, and he agreed that it was dangerous. He just said: 'It is dangerous, and it is liable to burn you out.' I took the matter up with him the third time, and tried to get him to pay me the freight money back on the hulls. I asked him if he could refund the freight money on the hulls; that I could not use them and did not intend to have anything more to do with them; that I had notified the Planters' Oil Company that I had abandoned the hulls. He said he could not pay back the freight money to me. I had paid the freight before I went into the car. I did not examine the hulls at that time. The car was not near the grain house when I paid the freight money, but was brought up to my grain house some time during the evening or night of the 6th. Before it was discovered the seed were afire, some few had been thrown into the grain house. After I found out there was a fire in the car, I examined the hulls that had been unloaded in the house, to see if any fire had dropped in them. I did not find any fire or heated hulls. I made a second examination of those hulls in the house between sundown and dark, before we closed up. I had the negro turn the hulls with the seed fork, and had my boy examine them carefully by running his hands through the hulls. I had three negroes working for me at that time. I found the seed house on fire between 4:30 and 5 o'clock in the morning. It was a total loss. The house was worth $1,000, and contents $2,280.05. * * * As to whether or not I had any privilege of examining that car until the freight was paid on it as indicated on the waybill of shipment, I never asked the agent to allow inspection. I did not attempt any inspection before I paid the freight. I paid the freight and had it delivered to me over at the grain house. The car containing the hulls was about 10 feet from the house. The seed that were put in the house were dropped right at the door of the room. There were 17 tons of hulls in the car, and they had taken out about 1,500 or 1,800 pounds when the fire was discovered. I did estimate, a short time after the fire, that they had unloaded about a ton and a half into the house. When I discovered the fire in the car, it was just opposite the door north of the panels of the door in the north end of the car, about the center of the load, rather than near the top or bottom. I knew that, if they were afire in the car, they were liable to continue to burn and destroy the car, and also destroy my house and contents. I was uneasy about them. Talking about the protecting of my property there, and why I did not satisfy myself that the fire had been removed from the car, I presumed that Mr. Arendale and the negro got all the fire out. I turned the matter over to Mr. Arendale to look after. I asked Mr. Arendale to remove that car and do something with it. I had already paid the freight on it; in other words, I wanted the railroad company to take the hulls off my hands. I did not tender them to the railroad company and offer to pay freight on them as a shipment back to the oil mill at Hearne. I had never rejected the hulls in the house, but I did reject the hulls in the car. I did not offer to unload those hulls in the house back into the car. I knew Mr. Arendale was there, trying to get the fire out of the car and keep the car from burning up. I understood what he was there for. He had my permission to use the negroes. I did not leave any one there to guard or watch the car when I left my place of business about dark that evening. I went home and left the property

there, locked up my place of business, with the belief and fear in my mind that the fire would break out and destroy the property. I did not think it was my duty to watch it all night. I watched the fire all day, made an examination of the hulls in the house before I left, and I thought it was the duty of the railroad company to put a watchman over the car. I suppose a man could have been hired to watch the property during the night for not exceeding $5. Late that evening, about sundown, the negro and I took a fork, and went around there, and tried to remove those burning hulls on the ground away from the car; but it was so hot, every time we undertook to move them, the hulls would flame up. I did not pour water on it, because we did not have any. We would have had to carry water from a well a distance of about 100 yards. I do not know of my own knowledge where the· fire that burned the hulls originated. I do not know whether it originated in the car or in the house."

He further testified that:

There was another house near his grain house. "There were two houses—one on the side, a small house, and one on the north, an old seed house. It was 6 or 8 feet from the north end of my grain house. It was there when I signed the lease contract. The Groesbeck Oil Company owned it. I do not think any one else owned it. I bought that house from the Groesbeck Oil Company a few years after I built this grain house. I owned this old seed house for four or five years, and sold it to Tom Cameron. He did not own the house at the time of the fire that burned me out. I understand that West Austin owned the house at that time. That house had been used for some months before the fire, by some oil company, for storing oil. I do not know what company it was. I know it to be a fact that the quantity of gasoline and coal oil stored in the place in question had an effect on the hazard with regard to· the fire insurance rates. The agent told me it made a decided increase in the rates. I do not know when they ceased to use it for the storing of oil. I could not be positive about it. There was another house, built later on, near there, from which they sold. I do not know whether this house had been abandoned at the time of the fire or not. I do not know whether there was any oil in it or not. After this house began to be used for oil, I had one insurance policy that was canceled. That was not renewed, and I was told by the insurance agent that he could not get any more insurance there, and I never made application to have the policy renewed when it run out. I had other insurance that expired and was not renewed for the same reason. I had insurance with Mr. Barnett, the insurance agent there, of the First National Bank. I had one policy of $600, taken out in March, that expired, and they would not renew it. Between the time they first began using that house for oil and the fire I tried to procure insurance. I went to the insurance agent, and asked him about insurance, and I told me he could not get me any insurance. He said it was on account of the oil being stored in that seed house next to me. I was told I could not get any more. He did not tell me that the day of the fire, nor the day before the fire. It was several months before the fire, two or three months before the fire. The insurance agent told me that he could not write any more insurance on account of oil being in the house. It was in the spring—it might have been in March—he notified me he could not write the policies. This was Mr. Barnett, who lived at Thornton. There was another insurance agent at Thornton. a Mr. Sheppard. I had a policy with Mr. Sheppard at the time the oil was stored in the house. I do not think Mr. Sheppard made any statement to me about carrying further insurance. I never made any application to Mr. Sheppard. I did not think he could write it, if he knew the oil was there."

Rast Chambers, witness in behalf of appellant, testified in substance as follows:

"I worked in the car that morning, and the fire was that night. Mr. Walling said, 'Unload the car.' We began unloading the car in the morning about 6:30 or 7 o'clock, I suppose. The car had been placed there before we went to work. We were unloading the hulls when we found the fire, and I went and told Mr. Walling, and he had me go and tell Mr. Arendale, who came over and had us throw the hulls in the car over on the outside of the car, and we threw them out, and I thought we had all of the fire out of them. I was working for Mr. Walling. I was in Mr. Walling's employ."

Ivan Walling testified, in substance, as follows:

"I am the son of J. P. Walling. I did not have anything to do with the handling of the hulls in the car. I saw some of the hulls that were thrown out of that car into the house, which was about 9 or 10 o'clock. I examined them to see if there was any fire in them. I dug in the hulls with my hands; had a darky take a seed fork and turn them over and scatter them around. There was something under a ton in the house. They were in the doorway mostly, right where they were thrown from the car. Late in the evening I made another inspection of the seed when we were fixing to close the grain house to go home. I made the same examination I did before, or maybe a better examination. The fire occurred some time after midnight. When I got there, I observed that the car and the house were both burning. The roof was burning on the side of the house next to the car. The fire was blazing along the eaves of the house, and was about even with the car, and was burning along toward the center of the house on the west side. Before going home that night I went around there and tried to put out the hulls burning on the ground. There was still some hulls burning there that night when I left for home. My father was there when we closed up to go home for supper."

The foregoing is, we believe, the material testimony bearing upon the questions involved. It has not been detailed as fully as it appears in the record, but it is sufficiently full for an understanding of this opinion. The facts disclosed are· not identical with the facts of any case cited by counsel or known to us, but they present a case so similar to some of those to which our attention has been called that the cited cases furnish an unerring guide for its proper determination. The contract involved in the decision of the case is plain and unambiguous, and it is clearly apparent, from it and the circumstances under which it was executed, that it was the purpose and intention of the parties to it that the appellee should be released from all liability for damages occasioned by fire resulting from its negligence. The contract releases the appellee, the lessor, from "all liability whatever on account of any loss or damage by fire to the property of the lessee, whether occasioned by sparks from locomotives or otherwise, or from any other cause whatsoever growing out of the making of this lease." The testimony would not justify the conclusion that the fire which destroyed appellant's property was set by sparks from one of ap-

pellee's locomotives, but the language of the contract just quoted is sufficient to cover any and all fires communicated to said property by any act of appellee, except such, perhaps, as may have been willful and wanton. The evidence is sufficient to show that the fire which burned appellant's house and its contents might have originated in one of three ways, namely, by the hulls which had been thrown into the seed house from the car becoming ignited from latent sparks in them, or by the hulls left in the car becoming ignited from latent sparks left in there, or by sparks from the burning hulls, which had been thrown out of the car on the ground near the car by the appellee's local agents and the appellant's hired hand. There is no testimony, however, that would warrant the conclusion that the fire was communicated to appellant's property by any willful or wanton act of any agent of the appellant.

[1] Negligence, as is well understood, includes both acts of commission and omission. It is the doing of that which a reasonably prudent person would not do under the circumstances of the situation, or the failure to do that which a reasonably prudent person would have done under the circumstances. Therefore, if the person charged with negligence does an act of which he is conscious, or fails to do an act of which he is conscious, and such act of commission or omission is one that a reasonably prudent person would not have been guilty of under the same or similar circumstances, and is unattended with wantonness or willfulness, such act, we apprehend, would be included in the terms of a contract, such as the one we have under consideration, exempting such a person from the consequences of his negligence. Plainly, it was the intention of the appellant and appellee in this case to contract against fire which might occur as the result of the conduct of the appellee's business, and while the escape of sparks from its locomotives might be regarded as the most fruitful source of setting out fires in the conduct of appellee's business, it cannot by any means be said that it was the only source from which fires might be expected and contemplated by the parties in the execution of the contract in question. That the parties to said contract realized that in the conduct of appellee's business fires might originate from other sources than the escape of sparks from locomotives, and intended to release appellee from liability for damages sustained by appellant as a result of such fires is clearly manifested by the language of the contract, which exempts appellee not only from fires occasioned by sparks from locomotives, but also from fires occasioned "otherwise."

[2-4] The contract being unambiguous, it was the duty of the court to construe it, and we think the undisputed evidence, together with the language of the contract, required the court to hold that its terms released appellee from liability. None of the property

for the loss of which appellant sues was in the possession of the appellee at the time the fire which destroyed it occurred, and "the terms of the contract do not embrace property for which appellee could be held liable as a common carrier. Hence the statute of this state declaring that a common carrier shall not limit its common liability by contract is not applicable. Railway Co. v. Carter, 95 Tex. 461, 68 S. W. 159; Wooldridge v. Ft. Worth & D. C. Ry. Co., 38 Tex. Civ. 551, 86 S. W. 942; Talley v. Railway Co., 176 S. W. 65; Hartford Fire Ins. Co. v. Railway Co., 175 U. S. 91, 20 Sup. Ct. 33, 44 L. Ed. 84. In the cases here cited it is, in effect, held that the occupancy of a railway company's right of way at the time of the fire which destroyed the property sued for, under lease which limited the railway company's liability, as does the contract involved in the case at bar, no recovery for the loss could be maintained, even though the proximate cause of such loss may have been the negligence of the railway company.

[5, 6] This brings us to appellant's proposition that the trial court erred in holding that there was no evidence which raised the issue of appellant's right of recovery for damages growing out of his failure to procure insurance, because of the storage of inflammable oils in the Alston house near appellant's property. We do not believe this proposition should be sustained. We agree in the main with the views expressed by counsel for the appellee upon this phase of the case. The house referred to in the proposition had been used for storing oil for some time prior to the execution of the contract between appellant and appellee, and it is a well-established general rule, we believe, that the tenant, in the absence of an agreement to the contrary, takes the rented premises as he finds them, under the doctrine of caveat emptor. If it should be conceded, as is argued by appellee's counsel, that the appellee was the landlord of both the appellant and the person who was storing oils in the adjacent building, we do not believe the facts in evidence would justify a holding that appellee was liable for the loss occasioned by the failure of the appellant to have his property covered by insurance against fire at the time of its destruction. It does not appear that the storing of oils, etc., in the building was an unlawful business, or that the same was conducted in a manner that would justify the conclusion that it was a nuisance of any character. Neither does it appear that the appellee, as landlord or otherwise, had any connection with the storing of oils in said building. Furthermore, there is, in fact, no testimony in the record which would warrant a finding that the relation of landlord and tenant between the occupant of the house in which the oils were stored and the appellee existed. The testimony does show, we think, that the appellant failed to make any effort to secure insurance on his property at any

reasonable time prior to the fire. But, if mistaken in the foregoing, then we think it is very clear that the damages sought to be recovered on this branch of the case could not be said to be within the reasonable contemplation of the parties at the time of the execution of the lease contract, or such as would naturally and probably result from a breach of said contract, hence too remote.

[7] The fifth assignment of error complains of the exclusion of certain testimony offered by the appellant which he claims tended to show an admission on the part of the appellee that the "car of hulls," when burned, was in transit. There was no error in this ruling of the court. The testimony excluded, in the view we take of the case, was immaterial and irrelevant. The appellant did not sue to recover the value of the hulls destroyed in the car, but for the value of his house, situated on appellee's right of way, and the hulls therein. There is no pretense that this house or its contents was in the possession of the appellee at the time of the fire, and the testimony excluded would be of no value in determining the liability of the appellee for the destruction of said house or its contents.

The several assignments of error have been carefully considered, with the conclusion reached that none of them disclose reversible error. The judgment of the court below is therefore affirmed.